# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| BEEMAN BERRY FARM, LLC, individually and on behalf of all others similarly situated, | **Case No.** |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| vs. | **DEMAND FOR JURY TRIAL** |
| BAYER CROPSCIENCE LP, BAYER CROPSCIENCE, INC., CORTEVA, INC., CARGILL INCORPORATED, BASF CORPORATION, SYNGENTA CORPORATION, WINFIELD SOLUTIONS, LLC, UNIVAR SOLUTIONS, INC., FEDERATED CO- OPERATIVES LTD., CHS INC., NUTRIEN AG SOLUTIONS INC., GROWMARK INC., GROWMARK FS, LLC, SIMPLOT AB RETAIL SUB, INC., AND TENKOZ, INC., | |
| Defendants. | |

Plaintiff Beeman Berry Farm, LLC, by and through its undersigned counsel, brings this Complaint on behalf of itself and all others similarly situated against Defendants Bayer CropScience LP, Bayer CropScience, Inc., Corteva, Inc., Cargill Incorporated, BASF Corporation, Syngenta Corporation, Winfield Solutions, LLC, Univar Solutions, Inc., Federated Co- Operatives Ltd., CHS Inc., Nutrien Ag Solutions Inc., Growmark Inc., Growmark FS, LLC, Simplot AB Retail Sub, Inc., and Tenkoz, Inc. (together, "Defendants") for violation of federal antitrust laws, state antitrust laws, state unfair competition laws, consumer protection laws, and unjust enrichment laws.

## I.    INTRODUCTION

1.    This case is about the future of the farming industry in America. Over the last few years, the cost of Crop Inputs – seeds and crop protection chemicals such as fungicides, herbicides, and insecticides – has increased at a significantly faster rate than profits from farmers' crop yields. These cost increases are proving increasingly devastating to farmers, who are now the least profitable level of the American food supply chain and are drowning in hundreds of billions of dollars of operating debt that is forcing them into bankruptcy at a record pace, creating a crisis in the agriculture community.

2.    Plaintiff's action focuses on an unlawful agreement between the above-identified Defendants to artificially increase and fix the price of Crop Inputs, ranging from seeds to crop protection chemicals such as pesticides (e.g., herbicides, fungicides and insecticides) used by farmers.

3.    Defendants are manufacturers, wholesalers, and retailers of Crop Inputs.

4.    Defendants BASF Corporation, Bayer CropScience, Inc., Corteva, Inc., and Syngenta Corporation (the "Manufacturer Defendants") are manufacturers of Crop Inputs.

5.    Defendants Cargill Incorporated, Univar Solutions, Inc., and Winfield Solutions, LLC (the "Wholesaler Defendants") are wholesalers of Crop Inputs.

6.    Defendants CHS Inc., Federated Co-Operatives Ltd, Growmark Inc., Nutrien Ag Solutions Inc., Simplot AB Retail Sub. Inc., and Tenkoz Inc. (the "Retailer Defendants") are retailers for Crop Inputs.

7.    Over the past three decades, a series of mergers and acquisitions created the "Big Four" of the crop inputs industry: BASF, Bayer, Corteva and Syngenta—the named Manufacturer Defendants in this action. Together these companies dominate the seed and crop protection

chemicals input markets. For example, in 2014-2015, these firms together controlled over 82% and 76% of corn and soybean seed sales. Upon information and belief, Defendants' share of these markets has increased since then.

8.    The Manufacturer Defendants seek to channel purchases of their Crop Inputs through either their own digital platforms or through traditional agricultural wholesale and retailers, namely, the Wholesale and Retail Defendants, so that they can artificially increase the prices of Crop Inputs.

9.    The Manufacturer Defendants maintain a competitive advantage over the Wholesale and Retail Defendants who are economically dependent upon large rebates from the Manufacturer Defendants tied to sales goals. As a result, pushing the Manufacturer Defendants' products is engrained into the traditional agricultural wholesale and retail business model, from which all three defendant groups profit well.

10.    As the number of manufacturers shrank to the Big Four, as well as a limited number of wholesalers and retailers, a lack of competition has left farmers with less affordable Crop Inputs.

11.    Leading to this growing-untenable situation for farmers, Defendants established a secretive distribution process that keeps Crop Inputs prices inflated at supracompetitive levels. In furtherance of their conspiracy, Defendants also denied farmers access to relevant market information, including transparent pricing terms, that would allow comparison shopping and better-informed purchasing decisions, as well as information about seed relabeling practices that would enable farmers to know if they are buying newly developed seeds or identical seeds repackaged under a new brand name and sold for a higher price.

12.    Beginning at least as early as 2014, new online Crop Inputs sales platforms offered pricing comparison tools to allow farmers to view what other farmers were paying for the same

Crop Inputs, increasing price transparency. These online sales platforms, including Farmers Business Network ("FBN") and AgVend Inc., were successful and in high demand with farmers.

13.     Viewing this success and the ability of such online sales platforms to impact the market position and price control of the traditional agricultural wholesale and retail distribution, Defendants conspired and coordinated to boycott these online Crop Inputs sales platforms. For example, the Manufacturer Defendants and Wholesaler Defendants agreed amongst themselves not to sell Crop Inputs to FBN and enforced strict discipline on Retailer Defendants who failed to comply with the boycott. Defendants Syngenta, Bayer, BASF, and Corteva used audits and inspections of their authorized retailers to ensure that online Crop Inputs sales platforms were unable to obtain Crop Inputs from their authorized retailers.

14.     Defendants' boycott succeeded. As a result of Defendants' anticompetitive conduct, online Crop Inputs sales platforms, such as FBN and AgVend, were unable to purchase Defendants' Crop Inputs to sell them on their platforms. Because Defendants are the dominant manufactures and sellers of Crop Inputs, this was a devastating blow to these sales platforms and directly harmed farmers in taking away a lower cost option for purchasing these Crop Inputs.

15.     Given the structure of the Crop Inputs industry with the necessary relationships between manufacturers, wholesalers, and retailers, an effective boycott of electronic platforms would not have been feasible absent actual coordination and cooperation among Defendants. Absent an agreement among themselves, Defendants' actions were against their independent economic self-interests.

16.     As a direct and proximate result of Defendants' anticompetitive conduct, Defendants' have maintained supracompetitive prices for Crop Inputs by denying farmers access to accurate pricing information and have injured farmers by forcing farmers to accept opaque price

increases that drastically outweigh any increase in crop yields or market prices.

17.    Defendants' anticompetitive conduct is the subject of ongoing investigations by both the Canadian Competition Bureau ("CCB") and the United States Federal Trade Commission ("FTC").

18.    A Canadian federal court has found that there is sufficient evidence to require Defendants to also produce records concerning their coordinated anticompetitive conduct in the United States. Further, as reported by various news agencies, CCB officials have documents that suggest a coordinated effort among the corporations to block FBN.

19.    In regard to the FTC investigation, at least one defendant, Corteva, has received a subpoena directing it to submit documents to the FTC that are related to Crop Inputs "in order to determine whether Corteva engaged in unfair methods of competition through anticompetitive conduct."

## II.    PARTIES

**Plaintiff**

20.    Plaintiff Beeman Berry Farm, LLC is a Michigan corporation and had its principal place of business in Michigan at all relevant times. During the Class Period and while operating in Michigan, Plaintiff purchased one or more Crop Inputs, for its own use for its farming operation and not for resale, that was manufactured or sold by one or more Defendants. Plaintiff suffered injury as a result of Defendants' conduct alleged herein.

**Manufacturer Defendants**

21.    Bayer AG is a multinational pharmaceutical, chemical, and agriculture company. It organizes itself into four divisions, each with its own management and corporate organization. Legal entities within each division work together, follow a common strategy, and report up to the

same level of management.

22.    Defendant Bayer CropScience Inc. is a wholly owned subsidiary of Bayer AG headquartered in St. Louis, Missouri and incorporated in New York that develops, manufactures, and sells Crop Inputs in the United States.

23.    Defendant Bayer CropScience LP is a wholly owned subsidiary of Bayer AG headquartered in Research Triangle Park, North Carolina, and is a crop science company that sells Crop Inputs in the United States.

24.    Bayer CropScience Inc. and Bayer CropScience LP both operate as part of the Bayer Group's Crop Science division. Defendants Bayer CropScience Inc. and Bayer CropScience LP are collectively referred to as "Bayer."

25.    Defendant Corteva Inc. is a domestic corporation headquartered in Wilmington, Delaware, that develops, manufactures, and sells Crop Inputs in the United States.

26.    Defendant BASF Corporation ("BASF") is headquartered in Florham Park, New Jersey, and is the principal U.S.-based operating entity and largest subsidiary of BASF SE, a multinational pharmaceutical, seed, and chemical company. BASF develops, manufactures, and sells Crop Inputs in the United States.

27.    Defendant Syngenta Corporation is the main U.S.-based operating subsidiary of Syngenta AG, and is headquartered in Wilmington, Delaware. Syngenta develops, manufactures, and sells Crop Inputs in the United States.

**Wholesaler Defendants**

28.    Defendant Cargill, Inc. is a domestic corporation headquartered in Minnetonka, Minnesota. Cargill owns and operates a wholesaler AgResource Division, which distributes Crop Inputs to Cargill's retail network and to retailers. Cargill's AgResource Division maintains

contracts with each of Bayer, Corteva, BASF, and Syngenta entitling it to purchase and distribute branded Crop Inputs and entitling it to special rebates.

29.     Defendant Winfield Solutions, LLC ("Winfield United") is a domestic corporation headquartered in Arden Hills, Minnesota and incorporated in Delaware. Winfield United is a Crop Inputs wholesaler. It maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute branded Crop Inputs and entitling it to special rebates. Winfield United is also a major Crop Inputs retailer that operates as a cooperative owned by its members, which are 650 Crop Inputs retail businesses operating 2,800 retail locations throughout the United States and parts of Canada.

30.     Defendant Univar Solutions, Inc. ("Univar") is a Crop Inputs wholesaler. Univar maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute branded Crop Inputs and entitling it to special rebates. Univar Solutions, Inc. is a domestic corporation headquartered in Illinois and incorporated in Delaware.

**Retailer Defendants**

31.     Defendant CHS Inc. ("CHS") is one of the largest Crop Inputs wholesalers in the United States. Like many large wholesalers, it also operates retail networks bearing the CHS brand around the country that sell Crop Inputs from brick and mortar stores. CHS Inc. is incorporated and headquartered in the state of Minnesota.

32.     CHS and the retail networks it operates maintain contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

33.     Defendant Nutrien Ag Solutions, Inc. is both a Crop Inputs wholesaler and the largest Crop Inputs retailer in the United States. It sells Crop Inputs to farmers throughout the

country and maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates. Nutrien Ag Solutions, Inc. is incorporated in Delaware and has its principal place of business in Colorado.

34.    Defendant GROWMARK, Inc. d/b/a Farm Supply or FS, is a large Crop Inputs retailer headquartered in Illinois, with brick and mortar locations throughout the Midwestern United States. Growmark is incorporated in Delaware. Growmark maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

35.    Defendant Tenkoz Inc. is one of the largest Crop Inputs retailers in the United States. Tenkoz purchases and sells 25% of all crop protection chemicals sold in the United States annually through 550 retail locations and 70 wholesale locations around the country. Tenkoz is incorporated and headquartered in Georgia. Tenkoz maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

36.    Defendant Simplot AB Retail Sub, Inc. f/k/a Pinnacle Agriculture Distribution, Inc. is a large Crop Inputs wholesaler and retailer that operates 135 retail locations across 27 states. Simplot is headquartered and incorporated in Mississippi. Simplot maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

37.    Defendant Federated Co-operatives Ltd. is a large Crop Inputs retailer. It maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates. Federated is under investigation by the Canadian Competition Bureau for engaging in coordinated anticompetitive practices designed to

exclude competition in the Crop Inputs market.

### III.    JURISDICTION AND VENUE

38.    Plaintiff brings this action on behalf of the Classes under 18 U.S.C. § 1962(c) (the Racketeer Influenced and Corrupt Organizations Act (Civil RICO)) to recover actual and compensatory damages as well as three times actual damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(a) and (c). Plaintiff also brings this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1), and to recover actual and compensatory damages, treble damages, interest, costs, and attorneys' fees for the injury caused by Defendants' conduct.  Plaintiff also asserts state law class claims on behalf of the Classes to recover actual and/or compensatory damages, double and treble damages as permitted, pre- and post-judgment interest, costs, and attorneys' fees for the injury caused by Defendants' conduct.

39.    This Court has subject matter jurisdiction under 18 U.S.C. § 1964(c), 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that: (i) this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Classes are citizens of a state different from some defendants; and (ii) Plaintiff's state law claims form part of the same case or controversy as its federal claims under Article III of the United States Constitution.

40.    Venue is proper in this Court pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. § 15(a), and 28 U.S.C. § 1391(b), (c) and (d), because one or more Defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried

out in this District.

41.    This Court has personal jurisdiction over each Defendant because, inter alia, each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, shipped, sold, and/or delivered substantial quantities of Crop Inputs throughout the United States, including this District; (c) had substantial contacts with the United States, including this District; and/or engaged (d) in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including this District.

42.    The activities of Defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

## IV.    TRADE AND COMMERCE

43.    During the Class Period, each Defendant sold Crop Inputs in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial District.

44.    During the Class Period, Defendants collectively controlled a majority of the market for Crop Inputs in the United States.

45.    Defendants' business activities substantially affected interstate trade and commerce in the United States and caused injury in the United States.

## V.    RELEVANT MARKETS

46.    The relevant market for this action involves Crop Inputs in the United States, including the manufacture of Crop Inputs, the wholesale market for Crop Inputs, and the retail sales market for Crop Inputs.

47.     The Relevant geographic market is the United States.

## VI.     FACTUAL ALLEGATIONS

48.     Farmers in the United States are experiencing drastically increasing operating expenses while revenue and profits from their crop yields remain stagnant. For example, between 1995 and 2011, the cost of growing soybeans and corn tripled while yields for those same crops rose by only 18.9% and 29.7%, respectively.

49.     This trend has continued in recent years. One study found that seed, fertilizer, and pesticide costs were 32% of crop revenue between 1990 and 2006, increased to 36% of revenue between 2006 and 2015, but soared to 48% of crop revenue in 2015.

50.     In a 2018 survey, 80% of farmers reported that their costs had only continued to increase. As a result, farmers cannot pay their outstanding operating debts—estimated at well over $400 billion in 2019—and the rate of farm bankruptcies has accelerated, with declared farm bankruptcies increasing by 24% from 2018 to 2019, the biggest yearly increase since the Great Recession.

51.     The rate of cost increases of Crop Inputs was not caused by a rise in demand resulting from an increase in the amount of farmland or the number of farms, which has actually decreased during the Class Period.[1] Instead, the increases are a result of unjustifiably inflated, supracompetitive prices due to Defendants' anticompetitive conduct, including the Defendants' group boycott of online sales platforms such as FBN and AgVend.

52.     The market for Crop Inputs is structured to be secretive and opaque to obscure

---

[1] *See, e.g.*, U.S. Dept. of Ag. webpage "Farming and Farm Income" from https://www.ers.usda.gov/data-products/ag-and-food-statistics-charting-the-essentials/farming-and-farm-income/ (last visited March 1, 2021) and American Farmland Trust webpage "New Census of Agriculture Shows Decline in Number of America's Farms, Farmers, and Farmland" from https://farmland.org/new-census-of-agriculture-shows-decline-in-number-of-americas-farms-farmers-and-farmland/ (last visited March 1, 2021).

pricing data and product information that farmers need to make informed purchasing decisions about Crop Inputs. Because farmers lack the objective information and data needed to evaluate their purchases, farmers are forced to pay higher prices for Crop Inputs than they would in a competitive market. On top of this, farmers are unable to buy Crop Inputs without paying for the unnecessary overhead of brick-and-mortar retailers such as that provided by the Wholesaler and Retailer Defendants.

53.     The Manufacturer Defendants, who develop and produce between 75% to 90% of the most popular name brand Crop Inputs, guard their product prices from consumers. The Manufacturer Defendants allow their products to be sold only by wholesalers, including the Wholesaler Defendants; retailers owned or operated by the manufacturer; and licensed "authorized retailers," such as the Retailer Defendants.

54.     The contracts granting "authorized retailer" licenses contain confidentiality provisions that prohibit authorized retailers from disclosing the manufacturers' prices or any incentives, rebates, or commissions offered by the manufacturers to the authorized retailers.

55.     Manufacturers also engage in the practice of "seed relabeling," which repackages seeds that are already on the market under a new brand name so that they can be sold at a higher price. This practice takes further advantage of farmers' lack of access to objective performance and pricing data and can cause farmers to overpay for seed that could have been purchased for less from a different brand and/or to have less genetic diversity in seeds across their farms than they anticipated.

56.     At the retail level, pricing is similarly opaque and obscured. Wholesalers' contracts with authorized retailers contain confidentiality provisions, prohibiting retailers from disclosing the price paid to the wholesaler for Crop Inputs or the price at which retailers sell those exact same

Crop Inputs to other farmers. In addition, retailers sell Crop Inputs bundled together with related services, such as spraying or applying chemicals, to make it more difficult for farmers to ascertain the cost of any individual Crop Inputs or bundled service.

57.     The first online sales platforms for Crop Inputs launched in 2014, with the goal of modernizing the market, increasing price transparency, lowering prices, and providing farmers access to Crop Inputs directly from the Manufacturer Defendants. These online marketplaces were designed to avoid the existing opaque and inefficient distribution system established and maintained by Wholesaler and Retailer Defendants.

58.     Initially, online Crop Inputs sales platforms were successful. For example, more than 12,000 farmers signed up for FBN's service that provided objective performance data on Crop Inputs, and 6,000 farmers signed up for FBN's electronic sales platform.

59.     Wholesaler and Retailer Defendants recognized the threat posed by these online sales platforms to their market position and profit margins. A report published by CoBank, a cooperative partly owned by Crop Inputs retailers and a major lender to grain cooperatives, explained that price transparency would enable farmers to negotiate with Crop Inputs retailers and decrease the Wholesaler and Retailer Defendants' profit margins:

> Despite relatively low sales, e-commerce companies pose a threat to brick-and-mortar ag retailers in two ways. First, any new competitor will erode sales and margins to some degree and second, e-commerce sites increase transparency for product prices.

60.     These online sales platforms would provide farmers with several sources of easily accessed product price information. Farmers could then leverage that information in negotiations with local brick-and-mortar retailers. Traditional ag retailers that bundle products and services together into a single price would lose customers to e-commerce sites that allowed customers to purchase only the product. The e-commerce channel allows cost-sensitive farmers to eliminate

unwanted service costs like custom application and product warranties.

61.     Defendants recognized the threat imposed by these online sales' platforms and took steps to eliminate that threat.

62.     In 2016, Defendant Bayer formed an internal task force to study the long-term competitive impact of FBN's online platform.

63.     Defendant CHS, upon learning of FBN's online buying platform launch in 2016, sent a letter to farmers discouraging them from using FBN by falsely claiming that although FBN would be able to offer the same products at lower costs, "FBN just does it with little overhead and without returning any profits to you the farmer, while lining the pockets of investors and big data companies like Google."

64.     The Retailer Defendants and the Wholesaler Defendants knew that retaining their market positions and profit margins depended on excluding online sales platforms from the market, so they conspired to eliminate the platforms' product supply. To do so, the Retailer and Wholesaler Defendants pressured the Manufacturer Defendants—who rely on the Wholesaler and Retailer Defendants to recommend and sell their products to farmers—to cut off FBN's supply of Crop Inputs.

65.     The Manufacturer Defendants complied with the demands of the Wholesaler and Retailer Defendants to cut off FBN's supply, and Defendants initiated a joint boycott of online sales platforms, including FBN. When FBN attempted to purchase Crop Inputs from the Manufacturer and Wholesaler Defendants, they all refused and offered only pretextual excuses for their refusal.

66.     For example, when Syngenta's Head of Crop Protection Sales in the United States found out that a small number of branded Crop Inputs had been sold on online platforms in

violation of Defendants' boycott, he falsely claimed that online platforms would deliver counterfeit products and that, "[w]hen online entities acquire products from sources other than authorized dealers or contracted distributors, you'd better question and be concerned about the quality."

67.     To ensure the success of Defendants' boycott, Defendants imposed strict penalties on retailers who failed to comply with the boycott. For example, Syngenta initiated an audit of its authorized retailers after learning that some retailers had sold Crop Inputs product to FBN despite the boycott in order to identify and punish the retailers who made those sales to FBN.

68.     Defendants Bayer, BASF, and Corteva inserted mandatory language into their form contracts with authorized retailers that permitted audits of authorized retailers' books and records and on-site inspections at any time. Defendants Bayer, BASF, and Corteva used these contractual provisions to ensure that online sales platforms could not purchase branded Crop Inputs from an authorized retailer.

69.     Defendants also utilized trade associations in their attack on online sales platforms. CropLife America ("CropLife") is a trade association made up of major Crop Inputs manufacturers, wholesalers, and retailers, and serves as an ideal vehicle for collusion. CropLife America's board of directors is chaired by an executive from one of the Manufacturer Defendants, currently Paul Rea from BASF and previously Suzanne Wasson from Corteva. For the 2016-19 term, CropLife America's board of directors included executives from Defendants Bayer, CHS, Growmark, Tenkoz, and Simplot. There is not a single representative for farmers or farmer groups on CropLife America's board of directors, despite CropLife America's mission to "help ensure growers and consumers have the technologies they need to protect crops, communities, and ecosystems from the threat of pests, weeds, and diseases in an environmentally sustainable way."

70.     CropLife America's trade publication, "CropLife Magazine," repeated the concerns

expressed by CoBank about the alleged threat posed by online Crop Inputs sales platforms to Crop Inputs retailers' business. CropLife Magazine stated it was "concerned that the retailer could be disintermediated—i.e., that electronic platforms would 'cut out the middle man'—allowing growers to find product conveniently and at a lower market price," and decried the "devil known as 'price transparency,'" stating that "[g]rowers were not really as interested in buying and selling and storing product as they were in printing price lists off the Internet and waving them in their retailer's faces. Already low margins were about to race to the bottom."

71.    CropLife's PACE Advisory Council—a committee composed of the "heads of major ag retailers, market suppliers, equipment makers, and other agricultural analysts"—clearly identified the threat posed by online sales platforms to retailers and wholesalers at its 2017 annual meeting. CropLife's coverage of the event reported that "three letters . . . continually cropped up no matter what the topic of conversation happened to be – FBN (Farmers Business Network). To say that all things related to FBN and its business practices dominated much of the day-long event would be a gross understatement. Several members of the PACE Council described how FBN had negatively affected their business during 2017 by cutting into their already slim margins on various products."

72.    The impact of Defendants' boycott extended past branded product to generic products (i.e., Crop Inputs sold by non-Defendant manufacturers after the Manufacturer Defendants' patents expire). In a 2018 Forbes article, the CEO of a generic chemical products company stated it was wary of supplying FBN because it could anger existing sales channels, and that "[i]n an ideal world, if I could flip the switch and sell to these guys, I would do it in a heartbeat."[2]

---

[2] Amy Feldman, "This Scrappy Startup Wants to Save Family Farms. But Big Ag is Fighting Back," Forbes (2018) from https://www.forbes.com/sites/amyfeldman/2018/06/19/farming-ag-agriculture-farmers-business-

73.     During the class period, FBN also purchased Yorkton Distributors ("Yorkton"), a Canada-based retailer with longstanding supply agreements with Defendants Bayer, Syngenta, BASF, Corteva, and Winfield. Those agreements provided FBN with inventory of Crop Inputs to sell to farmers. However, the Wholesaler and Retailer Defendants threatened to retaliate against the Manufacturer Defendants if they honored the agreements. As a result, the Manufacturer Defendants agreed to boycott Yorkton and abruptly canceled their longstanding supply contracts within a few months of FBN's March 2018 acquisition of Yorkton.

74.     After FBN purchased Yorkton, in an email dated April 6, 2018, Defendant Univar stated that it had informed FBN that Univar would cease to conduct business with FBN after July 31, 2018, and stated: "FBN is a data company that wants to collect and aggregate data to eventually sell for a profit to companies that will use the data to make farmers grow us food for nothing. If anyone thinks socialism is going to feed the world just call Russia first and see how that worked out." The Univar email also criticized FBN's model of transparency, stating that "[m]argin compression is not the way to a brighter future and that is all FBN is currently offering."

75.     FBN co-founder Charles Baron stated that the response by the Canadian industry after its purchase of Yorkton was similar to the United States' industry response when FBN first launched in 2014, and that "[t]hese actions caused serious harm and really blocked FBN from being able to provide and fulfill a lot of the basic services we provide growers." He also noted that FBN "faced an extreme amount of resistance from the industry at being able to bring what should be very basic services to growers."[3]

---

network/?sh=6ee91ddc6312 (last visited March 1, 2021).  The CEO of the generic-chemicals maker would agree to speak only on the condition that he remain anonymous.

[3] Jacob Bunge, "Canadian Antitrust Officials Probe Farm Giants," The Wallstreet Journal (2020) from https://www.wsj.com/articles/canadian-antitrust-officials-probe-farm-giants-11580990400/ (last visited March 1, 2021)

76.     Defendants' boycott of FBN was successful and caused FBN to begin developing its own Crop Inputs to sell on its online marketplace.

77.     Defendants' boycott also applied to AgVend, and AgVend ultimately shut down its online sales platform and now establishes web-based storefronts for traditional brick- and-mortar retailers.

78.     As a result of the Defendants' coordinated boycott, farmers are and have been deprived of the opportunity to purchase Crop Inputs at transparent, competitive prices from online platforms. Instead, farmers are forced to continue paying artificially inflated prices for Crop Inputs purchased from local retailers subject to Defendants' confidentiality requirements and seed relabeling practices.

79.     The Canadian Competition Bureau ("CCB") launched an investigation into Defendants for collusion under Section 10 of the Competition Act Canada (R.S.C., 1985, c. C-34). The CCB inquiry is focused on the conduct of Federated Co-operatives Limited, Cargill Limited, Winfield United Canada ULC, Univar Canada Ltd., BASF Canada Inc., Corteva Inc. and/or its affiliates, and Bayer CropScience Inc. and its wholly-owned subsidiary Monsanto Canada ULC in the seed and crop protection markets, and whether those entities engaged in practices reviewable under Part VIII of the Competition Act Canada.

80.     On February 11, 2020, a Canadian federal court granted in full *ex parte* applications made by Canada's Commissioner of Competition for the production of records against Cargill Limited, Winfield United Canada ULC, Univar Canada Limited, BASF Canada Inc., Bayer CropScience Inc. and its wholly-owned subsidiaries Monsanto Canada ULC and Production Agriscience Canada Company, Pioneer Hi-Bred Canada Company and Dow Agrisciences Canada Inc. relating to those practices. Over Defendants' objection, the Canadian federal court found

sufficient evidence to require Defendants to produce records concerning their coordinated anticompetitive conduct in the United States as well.

81.     Representatives of Defendants Bayer, Corteva, BASF, Univar and Cargill have said they intend to cooperate with the CCB's investigation.

82.     The United States Federal Trade Commission ("FTC") is also investigating potential anticompetitive conduct in the Crop Inputs market. At least one defendant, Corteva has received a subpoena from the FTC. On May 26, 2020, the FTC issued a subpoena to Defendant Corteva, directing it to submit documents pertaining to potential anticompetitive conduct with respect to Crop Inputs. Corteva confirmed in a 10-Q filing that the FTC's subpoena required it "to submit documents pertaining to its crop protection products generally, as well as business plans, rebate programs, offers, pricing and marketing materials specifically related to its acetochlor, oxamyl and rimsulfuron and other related products in order to determine whether Corteva engaged in unfair methods of competition through anticompetitive conduct."

83.     Defendants' anticompetitive conduct has had at least the following effects:

    a.     Price competition has been restrained or eliminated with respect to Crop Inputs;

    b.     The prices of Crop Inputs have been fixed, raised, stabilized, or maintained at artificially inflated levels;

    c.     Purchasers of Crop Inputs have been deprived of free and open competition; and

    d.     Purchasers of Crop Inputs, including Plaintiff, paid artificially inflated prices.

84.     During and throughout the Class Period, Plaintiff and Class members purchased Crop Inputs in the United States, for their own use and not for resale, that were manufactured or sold by Defendants.

85.     It is well recognized that in a multi-level chain of distribution, such as exists here,

an overcharge is felt throughout the chain of distribution. As noted, antitrust scholar Professor Herbert Hovenkamp stated in his treatise, <u>Federal Antitrust Policy, The Law of Competition and Its Practice</u> 564 (1994):

> A monopoly overcharge at the top of a distribution chain generally results in higher prices at every level below. For example, if production of aluminum is monopolized or cartelized, fabricators of aluminum cookware will pay higher prices for aluminum. In most cases they will absorb part of these increased costs themselves and pass part along to cookware wholesalers. The wholesalers will charge higher prices to the retail stores, and the stores will do it once again to retail consumers. Every person at every stage in the chain likely will be poorer as a result of the monopoly price at the top.

> Theoretically, one can calculate the percentage of any overcharge that a firm at one distributional level will pass on to those at the next level.

Similarly, Professor Jeffrey K. MacKie-Mason has stated, it is "well known in economic theory and practice, (that) at least some of the overcharge will be passed on by distributors and end consumers."

86.    The purpose of the Defendants' conspiratorial and unlawful conduct was to fix, raise, stabilize, and/or maintain the price of Crop Inputs.

87.    As a direct and proximate result of the alleged violations of antitrust laws, Plaintiff and Class members have sustained injury to their business or property, having paid higher prices for Crop Inputs than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were intended to punish and prevent.

88.    Further, for Plaintiff's RICO claims, Defendants' concerted action was made possible through ample formal and informal means.

89.    Defendants' scheme required them to work together to block new, electronic platforms from accessing Crop Inputs; thereby, trapping farmers into higher-priced purchases in

the inefficient and opaque Crop Inputs market.

90.     Defendants could not have individually performed such a scheme to defraud. Given the structure of the Crop Inputs industry with the necessary relationships between the Manufacturer, Wholesaler, and Retailer Defendants, an effective boycott of new electronic platforms would not have been feasible or possible absent actual coordination and cooperation among Defendants. The scheme was strengthened by the fact that the Defendants used their status as leaders in the agricultural community to lull consumers into believing their misrepresentations about FBN's business model and the Defendants' decision not to sell to FBN.

91.     Defendants have multiple networks for communications between themselves through which they formed and maintained their Crop Market Manipulation Enterprise, including trade association participation. Through their trade industry associations, Defendants pushed their false narratives about FBN. And as stated above, Defendants refused to sell to FBN.

92.     One such partner for coordination is CropLife America, a trade association that represents companies that develop, register, and sell pesticide in the United States. Only manufacturers and distributors of Crop Inputs are eligible for full membership in CropLife America.

93.     CropLife's Board of Directors meets annually to discuss developments in the Crop Inputs market and has specifically discussed the entry of electronic platforms. CropLife is funded by its members and reported historic high funding levels over the last decade to defend the industry.

94.     CropLife's Board of Directors is always chaired by an executive from one of the Manufacturer Defendants—currently BASF's Paul Rea, who was preceded by Corteva's Suzanne Wasson. For the 2016 to 2019 term, CropLife's Board of Directors also included executives from Defendants Bayer, Growmark, Tenkoz, and Simplot. The current board also includes an executive

from Winfield's parent company, Land O'Lakes. The Board of Directors exclusively comprises representatives from large Crop Inputs manufacturers, distributors, and retailers, making it an ideal vehicle for collusion.

95.    Defendants regularly use CropLife American as a conduit for their responses to concerns about anti-competitive effects of the consolidation and opacity of the Crop Inputs manufacturing and distribution markets. For example, CropLife American opposed Senator Elizabeth Warren's efforts to investigate recent mergers involving Defendants Bayer, Corteva and Syngenta. Similarly, when the Ninth Circuit concluded that EPA's registrations of certain Manufacturer Defendants' dicamba pesticide products did not adequately consider the products' anti-competitive effects, CropLife America wrote on behalf of its member companies, including Defendants, in support of the EPA decision.

96.    Trade Association conferences are another vehicle for collusion among Defendants. For example, the Agricultural Retailers Association ("ARA") hosts an annual in-person industry conference every year, which is attended by representatives from all major Crop Inputs retailers, as well as representatives from each Defendant. These industry conferences provide ample opportunity for Defendants to not only agree among themselves how to block electronic platforms from emerging, but also to coordinate with the other levels of the distribution chain. In fact, as noted above, the threat posed by FBN was the primary discussion topic at the PACE Advisory Council's 2017 annual meeting. Over the last decade, CropLife America has reported that they have improved cooperation and camaraderie with the Agricultural Retailers Association.

97.    Media reporting has also confirmed that major farmer retailers and wholesalers have circulated letters and emails urging farmers and manufacturers to avoid FBN.[4]

---

[4] Jacob Bunge, "Tech Startup, Trying to Be Amazon for Farms, Runs into Ag Giants," The Wall Street Journal (Aug. 30, 2020), https://www.wsj.com/articles/tech-startup-trying-to-be-amazon-for-farms-runs-into-ag-giants-

98.    Initial documents obtained by the Canadian Competition Bureau show that these same market players shared strategies on how to block FBN in Canada and pretextual justifications for their actions. For example, one Univar executive sent his team talking points to justify its decision to boycott FBN and encouraged them to share the message with retailers. The executive also shared the talking points with its manufacturer suppliers. The executive noted that he has already talked to manufacturer suppliers about FBN and whether to sell to them during the week of April 2, 2018.

99.    It is not surprising that Defendants' response to the FBN's market threat was to engage in illicit and anticompetitive behavior. Several Defendants are antitrust recidivists. Competition experts have noted that past experience with participating in cartels enables companies to spot opportunities to profitably engage in anticompetitive conduct while evading detection. Competition Policy International maintains a list of the "fifty-two leading recidivists," in which BASF and Bayer are among the top five antitrust recidivists, and Corteva also appears on the list.

100.    Given the structure of the Crop Inputs industry with the necessary and significant relationships between manufacturers, wholesalers, and retailers, an effective boycott of electronic platforms would not have been feasible absent actual coordination and cooperation among Defendants. The boycott could only work if each Manufacturer Defendant agreed to the plan; otherwise, a Manufacturer Defendant that broke from the boycott could have established itself as the primary supplier to electronic platforms and grown its customer base by opening new distribution channels for its Crop Inputs, taking market share from its rival manufacturers.

101.    For these reasons, absent an agreement among them, Defendants' actions were

---

11598811850 (last visited March 1, 2021).

against their independent economic self-interest. For any one or more of the Defendants to provide Crop Inputs to electronic platforms presented a significant business opportunity because those platforms: (1) represented well-financed customers ready to purchase Crop Inputs in bulk quantity from a Manufacturer or Wholesaler Defendant; (2) would simplify the distribution channel and permit Manufacturer Defendants to retain more profit by reducing or eliminating the need for transport costs, rebates, and incentive programs to wholesalers and retailers; and (3) presented an opportunity for an individual Manufacturer Defendant to increase profits by growing its market share through sales to farmers nationwide, not merely where its authorized retailers were located enjoyed the largest market share within a specific geographic area.

## VII.    CLASS ALLEGATIONS

102.    Plaintiff brings this action on behalf of itself, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a) and (b)(2) seeking equitable and injunctive relief on behalf of the following classes:

a.    All persons or entities residing in the United States that, during the Class Period, purchased from a Defendant a Crop Input manufactured by a Manufacturer Defendant;

b.    All persons or entities residing in the United States that, during the Class Period, purchased from a retailer other than a Retailer Defendant a Crop Input manufactured by a Manufacturer Defendant.

103.    Specifically excluded from the Classes are the following: purchasers of Crop Inputs for resale; Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant; any federal, state governmental entities; any judicial officer presiding over this action and the members of his/her immediate family and judicial staff; any juror assigned to this action; and any co-conspirator identified in this action.

104.    **Numerosity**. Because such information is in the exclusive control of Defendants,

Plaintiff does not know the exact number of the Class members. Due to the nature of the trade and commerce involved, Plaintiff believes that there are thousands, if not tens of thousands, of members in the Classes and that they are sufficiently numerous and geographically dispersed throughout the United States so that joinder of all Class members would be impracticable. Class treatment is the superior method for fairly and efficiently adjudicating this controversy.

105. **Class Identity**. The above-defined Classes are readily identifiable and are ones for which records should exist.

106. **Typicality**. Plaintiff's claims are typical of other class members' claims because it was injured through Defendants' uniform misconduct and paid supracompetitive prices for Crop Inputs. Accordingly, by proving its own claims, Plaintiff will necessarily prove the other class members' claims.

107. **Common Questions Predominate**. Common legal and factual questions exist as to all Class members. This is particularly true given the nature of Defendants' unlawful anticompetitive conduct, which was generally applicable to the Classes as a whole. These questions include but are not limited to the following:

    a.     Whether Defendants engaged in a scheme to defraud by intentionally blocking electronic platforms, including FBN, from access to Crop Inputs by agreeing not to sell products to them and misrepresenting the reasons for that decision;

    b.     Whether Defendants engaged in a combination or conspiracy amongst themselves to fix, raise, maintain, and/or stabilize the prices of Crop Inputs in the United States;

    c.     Whether Defendants formed an enterprise (the "Crop Input Market Manipulation Enterprise") within the meaning of RICO;

    d.     Whether Defendants engaged in a pattern of racketeering to defraud purchasers of

Crop Inputs through blocking electronic platforms, including FBN, from access to Crop Inputs by agreeing not to sell products to them and misrepresenting the reasons for that decision;

e. The identity of additional participants in the alleged combinations and conspiracy, if any;

f. The duration of the alleged combination or conspiracy and nature of the acts carried out by Defendants in furtherance of the combination or conspiracy;

g. Whether the alleged combination or conspiracy violated Section 1 of the Sherman Act;

h. Whether the alleged combination or conspiracy had the effect of artificially inflating the price of Crop Inputs sold in the United States during the Class Period;

i. Whether the alleged conspiracy violated state antitrust, unfair competition, and/or consumer protection laws;

j. Whether the Defendants unjustly enriched themselves to the detriment of the Plaintiff and Class members, thereby entitling Plaintiff and Class members to disgorgement of all benefits derived by Defendants;

k. Whether Defendants' conduct caused injury to the Class members;

l. Whether Defendants took actions to conceal their unlawful conspiracy;

m. The appropriate injunctive and related equitable relief; and

n. The appropriate measure and amount of damages to which Plaintiff and other Class members are entitled.

108. **Adequacy**. Plaintiff can and will fairly and adequately represent and protect the class members' interests and has no interests that conflict with or are antagonistic to those of the

classes. Moreover, Plaintiff's attorneys are experienced and competent in antitrust and class action litigation.

109.    **Superiority**. Class action treatment is the superior procedural vehicle for the fair and efficient adjudication of the claims asserted because: among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

110.    The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

111.    Defendants have acted on grounds generally applicable to the Classes, thereby making final injunctive relief appropriate with respect to the Classes as a whole.

## VIII.    STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFF'S CLAIMS

112.    Any applicable statute of limitations for Plaintiff and the Classes has been tolled and/or Defendants are equitably estopped from asserting a statute of limitations defense by reason of Defendants' concealment of the conspiracy.

113.    Group boycotts and other antitrust violations are inherently self-concealing.

114.    Throughout the Class Period, Defendants and their co-conspirators engaged in secret conspiracies that did not reveal facts that would put Plaintiff or the Classes on inquiry notice that there was a conspiracy to fix prices of Crop Inputs, and effectively and affirmatively concealed

their unlawful combination and conspiracy from Plaintiff and the Classes.

115.    Plaintiff and Class members had neither actual nor constructive knowledge of the facts constituting their claims for relief. Plaintiff and Class members did not discover, nor could have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this Complaint, because of the deceptive practices and secrecy employed by Defendants and their co- conspirators to conceal their combination.

116.    As discussed above, the market for Crop Inputs is structured to maximize opacity in order to deny farmers access to pricing data and product information that farmers need to make informed decisions about Crop Inputs purchases. The Defendants use confidentiality provisions in their contracts to restrict disclosure of the prices of Crop Inputs. Defendants also employ seed relabeling and bundling in order to further prevent farmers, including Plaintiff and the Classes, from accessing pricing data and information about the Crop Inputs market.

117.    Plaintiff and the Classes did not have actual or constructive notice of the conspiracy alleged herein until the Canadian Competition Bureau launched its inquiry and issued subpoenas in February 2020, or until Defendant Corteva's September 2020 disclosure that the FTC had subpoenaed Corteva for documents "in order to determine whether Corteva engaged in unfair methods of competition through anticompetitive conduct."

### IX.    CLAIMS FOR RELIEF

### COUNT I
### Violation of The Racketeer Influenced and Corrupt Organizations Act
### (Civil RICO) under 18 U.S.C. § 1962(c) and (d)
### (on behalf of Plaintiff and the Nationwide Class)

118.    Plaintiff incorporates and realleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

119.    Plaintiff brings Count I on behalf of the Class against all Defendants.

120.    At all relevant times, Defendants have been "persons" under 18 U.S.C. § 1961(3).

121.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

122.    Section 1962(d) makes it unlawful for "any person to conspire to violate", among other provisions, Section 1962(c). See 18 U.S.C. § 1962(d).

123.    From at least 2016, to the present, Defendants have worked to manipulate the Crop Input market by blocking new online Crop Inputs sales platforms such as FBN's access to Crop Inputs by working together as an association-in-fact enterprise. These entities all participated directly or indirectly in a scheme to block online Crop Inputs sales platforms from access to Crop Inputs by agreeing not to sell products to these platforms, including FBN, and misrepresenting the reasons for that decision ("Crop Input Market Manipulation Enterprise"). Through the Crop Inputs Market Manipulation Enterprise, Defendants obtained illegal profits.

124.    As a direct and proximate result of their fraudulent scheme and common course of conduct, Defendants have illegally extracted billions of dollars from Plaintiff and the Class. As explained in detail below, the years-long misconduct of Defendants violated RICO Sections § 1962(c) and (d).

## A.    The Enterprise

125.    At all relevant times, Defendants operated as an association-in-fact enterprise, which was formed for the purpose of engaging in a scheme to defraud to block new online Crop Inputs sales platforms from access to Crop Inputs by agreeing not to sell products to these platforms, including FBN, and misrepresenting the reasons for that decision.

126.    The Crop Inputs Market Manipulation Enterprise consists of the following entities and individuals:

a.    **The Manufacturer Defendants**

127.    Defendant Bayer CropScience Incorporated develops, manufactures, and sells Crop Inputs in the United States.

128.    Defendant Bayer CropScience LP is a crop science company that sells Crop Inputs in the United States.

129.    Bayer CropScience Incorporated and Bayer CropScience LP both operate as part of the Bayer Group's Crop Science division.

130.    Defendant Bayer (formerly known as Monsanto) secretly formed a task force in 2016 to study the long-term competitive impact of FBN's electronic platform.[5]

131.    Defendant Corteva Incorporated develops, manufactures, and sells Crop Inputs in the United States.

132.    Defendant BASF develops, manufactures, and sells Crop Inputs in the United States.

133.    Defendant Syngenta Corporation develops, manufactures, and sells Crop Inputs in the United States.

134.    Each of these Defendants is a "person" under 18 U.S.C. § 1961(3).

135.    Each operated or managed the affairs of an enterprise, the Crop Input Market Manipulation Enterprise, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

---

[5] Application Record, *The Commissioner of Competition v. Bayer CropScience Inc. and Monsanto Canada ULC*, Court File No. T-159-20, pp. 13-14, 18 (Jan. 30, 2020).

### b.    The Wholesaler Defendants

136.    Defendant Cargill, Incorporated owns and operates a wholesaler, AgResource Division, which distributes Crop Inputs to Cargill's retail network and to retailers. Cargill's AgResource Division maintains contracts with each of Bayer, Corteva, BASF, and Syngenta entitling it to purchase and distribute branded Crop Inputs and entitling it to special rebates.

137.    Defendant Winfield Solutions, LLC is a Crop Inputs wholesaler. It maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute branded Crop Inputs and entitling it to special rebates. Winfield is also a major Crop Inputs retailer that operates as a cooperative owned by its members, which are 650 Crop Inputs retail businesses operating 2,800 retail locations throughout the United States and parts of Canada.

138.    Defendant Univar Solutions, Incorporated is a Crop Inputs wholesaler. Univar maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute branded Crop Inputs and entitling it to special rebates.

139.    Each of the Defendants is a "person" under 18 U.S.C. § 1961(3).

140.    Each operated or managed the affairs of an enterprise, the Crop Input Market Manipulation Enterprise, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

### c.    The Retailer Defendants

141.    Defendant CHS Inc. is one of the largest Crop Inputs wholesalers in the United States. Like many large wholesalers, it also operates retail networks bearing the CHS brand around the country that sell Crop Inputs from brick-and-mortar stores. CHS and the retail networks it operates maintain contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

142.     Defendant Nutrien Ag Solutions, Inc. is both a Crop Inputs wholesaler and the largest Crop Inputs retailer in the United States. It sells Crop Inputs to farmers throughout the country and maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

143.     Defendant GROWMARK, Incorporated, d/b/a Farm Supply or FS, is a large Crop Inputs retailer with brick-and-mortar locations throughout the Midwestern United States. Growmark maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

144.     Defendant Simplot AB Retail Sub, Incorporated, f/k/a Pinnacle Agriculture Distribution, Incorporated, is a large Crop Inputs wholesaler and retailer that operates 135 retail locations across 27 states. Simplot maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

145.     Defendant Tenkoz Inc. is one of the largest Crop Inputs retailers in the United States. Tenkoz purchases and sells 25% of all crop protection chemicals sold in the United States annually through 550 retail locations and 70 wholesale locations around the country. Tenkoz maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

146.     Defendant Federated Co-operatives Ltd. is a large Crop Inputs retailer. It maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates. Federated is under investigation by the Canadian Competition Bureau for engaging in coordinated anticompetitive practices designed to exclude competition in the Crop Inputs market.

147.     Each of the Retailer Defendants is a "person" under 18 U.S.C. § 1961(3).

148.    Each operated or managed the affairs of an enterprise, the Crop Input Market Manipulation Enterprise, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

**B.    Essential Purpose of Enterprise was the Scheme to Defraud.**

149.    At all relevant times, the Crop Inputs Market Manipulation Enterprise: (a) had an existence separate and distinct from each of the Defendants; (b) was separate and distinct from the pattern of racketeering in which Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the Manufacturer Defendants, the Wholesaler Defendants, the Retailer Defendants, and other entities and individuals associated for the common purpose of blocking electronic platforms, including FBN, from access to Crop Inputs by agreeing not to sell products to them and misrepresenting the reasons for that decision.

150.    Defendants had a strong motive to conspire to preserve their opaque market structure. If electronic platforms publicly published price lists for specific Crop Inputs, then the Manufacturer, Wholesaler, and Retailer Defendants could no longer keep prices confidential and charge inflated prices for identical Crop Inputs and/or maintain price opacity through seed relabeling and bundling.

151.    The Retailer Defendants and the Wholesaler Defendants knew that to retain their market positions and maintain their profit margins, they had to exclude electronic platforms from the market, so they conspired to cut off the platforms' product supply. Because the Manufacturer Defendants rely on the Retailer and Wholesaler Defendants to recommend and sell the Manufacturer Defendants' products to farmers, the Retailer and Wholesaler Defendants had to convince the Manufacturer Defendants to agree not to supply FBN and other platforms in order to make the boycott effective.

152.    Each member of the Crop Inputs Market Manipulation Enterprise shared in the financial windfall generated by the enterprise, and each member shared in the common purpose of forcing farmers to purchase Crop Inputs at supra-competitive prices.

153.    FBN threatened the Defendants' dominant market position and control over Crop Inputs pricing. As a result, rather than compete fairly with FBN, Defendants conspired to block its access to Crop Inputs by engaging in a group boycott. For instance, the Manufacturer, Wholesaler, and Retailer Defendants repeatedly blocked FBN's access to Crop Inputs by agreeing among themselves not to sell products to FBN.

154.    Given the structure of the Crop Inputs industry with the necessary relationships between manufacturers, wholesalers, and retailers, an effective boycott of electronic platforms would not have been feasible absent actual coordination and cooperation among Defendants. Absent an agreement among themselves, Defendants' actions were against their independent economic self-interests.

155.    The Crop Inputs Market Manipulation Enterprise engaged in, and its activities affected interstate and foreign commerce, because it involved commercial activities across state and national boundaries, such as the marketing, promotion, advertisement and sale or lease of the Crop Inputs throughout the country, and the receipt of monies from the sale of the same.

156.    Within the Crop Inputs Market Manipulation Enterprise, there was a common communication network by which co-conspirators shared information using the interstate mails and wires on a regular basis.

157.    Each member of the Crop Inputs Market Manipulation Enterprise had a systematic linkage to the others through corporate ties, contractual relationships, financial ties, and continuing coordination of activities.

158.     Through the Crop Inputs Market Manipulation Enterprise, Defendants functioned as a continuing unit with the common purpose of furthering the illegal scheme and their common purposes of blocking electronic platforms, including FBN, from accessing Crop Inputs by agreeing not to sell products to these platforms and misrepresenting the reasons for that decision.

159.     The ordinary business of Defendants is to engage in the manufacture, distribution, and sale of Crop Inputs. It is not part of their routine business to engage in acts of mail and wire fraud to block farmer access to alternative market participants and misrepresent the reasons for these decisions.

160.     While Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

161.     Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiff cannot fully know at present, because such information lies in the exclusive control of Defendants.

162.     This enterprise has continued for over four years (since 2016), and the enterprise (and pattern of racketeering) are ongoing and open-ended.

C.     **The Participation of Defendants in the Crop Inputs Market Manipulation Enterprise**

163.     Upon information and belief, Defendants are, and have been, in regular and constant communication regarding the Crop Inputs market.

164.     Upon information and belief, Defendants were all deeply involved in the Crop Inputs Market Manipulation Enterprise.

165.     The Crop Inputs Market Manipulation Enterprise depended upon Defendants

working together in shared concert to block new electronic platforms from accessing Crop Inputs and thus trapping farmers into higher-priced purchases in the inefficient and opaque Crop Inputs market. None of the Defendants could have individually pulled off this scheme to defraud. Given the structure of the Crop Inputs industry with the necessary relationships between the manufacturers, wholesalers, and retailers, an effective boycott of new electronic platforms would not have been feasible or possible absent actual coordination and cooperation among Defendants. The scheme was strengthened by the fact that these major industry players used their prestige and logos to lull the world into believing their misrepresentations about FBN's business model and their decision not to sell to FBN.

166.    Defendants have multiple networks for inter-firm communications to form and maintain the Crop Market Manipulation Enterprise through trade association participation and to use their trade industry associations to push their false narratives about FBN and Defendants' refusal to sell to FBN.

167.    One of the major places for coordination is CropLife America, a trade association that comprises major Crop Inputs manufacturers, wholesalers, and retailers. CropLife's Board of Directors is chaired by an executive from one of the Manufacturer Defendants—currently BASF's Paul Rea and previously Corteva's Suzanne Wasson. For the 2016 to 2019 term, CropLife's Board of Directors also included executives from Defendants Bayer, Growmark, Tenkoz, and Simplot. The Board of Directors exclusively comprises representatives from large Crop Inputs manufacturers, distributors, and retailers, making it an ideal vehicle for collusion.

168.    The Agricultural Retailers Association ("ARA") hosts an annual in-person industry conference every year, which is attended by representatives from all major Crop Inputs retailers, as well as representatives from each Defendant. These industry conferences provide ample

opportunity for Defendants to not only agree among themselves how to block electronic platforms from emerging, but also to coordinate with the other levels of the distribution chain. In fact, as noted above, the threat posed by FBN was the primary discussion topic at the PACE Advisory Council's 2017 annual meeting.

169.    The coordination through the Crop Inputs Market Manipulation Enterprise to block sales to FBN by Defendants was also not the first time Defendants had worked together to stop similar competition. Prior to 2016, manufacturers and the distribution channel partners recognized the threat from transparent, electronic platforms and worked together to block the threat when XSAg.com entered the market. Similarly, in 2018, Defendants continued to work together through Crop Input Market Manipulation Enterprise to counter an additional threat: FBN's entrance into the Canadian market. While many Defendants had initially agreed to continue their supply of FBN's Canadian retailer, a coordinated campaign through the Crop Input Market Manipulation Enterprise kicked in including through communications over the wires. The boycott was swift and covered the vast majority of the Crop Input market.

170.    Given the structure of the Crop Inputs industry with the necessary relationships between manufacturers, wholesalers, and retailers, an effective boycott of electronic platforms would not have been feasible absent actual coordination and cooperation among Defendants. The boycott would only work if each Manufacturer Defendant agreed to the plan; otherwise, the Manufacturer Defendant that broke from the boycott could have established itself as the primary supplier to electronic platforms and grown its customer base by operating a new distribution channel for its Crop Inputs, taking market share from its rival manufacturers.

171.    Defendants are in the regular business of making, distributing, and selling Crop Inputs. It is not routine for them to engage in fraudulent activities or to engage in a pattern of mail

and wire fraud.

172.    175.    Defendants have worked together on the scheme to defraud in shared concert since at least 2016, when FBN attempted to enter the Crop Input market.

**D.    The Pattern of Racketeering: Mail Fraud and Wire Fraud**

173.    To carry out the scheme to defraud, Defendants knowingly participated, directly or indirectly, and conducted the affairs of the Crop Inputs Market Manipulation Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and which employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

174.    The predicate acts of racketeering (18 U.S.C. § 1961(1)) engaged in by Defendants include, but are not limited to:

**a.    Mail Fraud**

175.    Defendants violated 18 U.S.C. § 1341 by engaging in an unlawful scheme to defraud involving false pretenses, misrepresentations, promises, half-truths, and omissions. In furtherance of this scheme, Defendants used the mails:

176.    Defendants shipped, or caused to ship, via interstate mail Crop Inputs to wholesalers, retailers, and farmer, and others that were distributed and purchased based on Defendants' market manipulation to exclude FBN.

177.    Defendants used the mails in furtherance of their scheme to defraud and, in fact, could not have accomplished their scheme to defraud without using the mails to ship Crop Inputs nationwide to victims in all fifty states.

**b.    Wire Fraud**

178.    Defendants violated 18 U.S.C. § 1343 by engaging in an unlawful scheme to

defraud involving false pretenses, misrepresentations, promises, half-truths, and omissions. In furtherance of this scheme, Defendants used the interstate wires.

179.   Defendants communicated with farmers via wire to provide false pretenses, misrepresentations, promises, half-truths, omissions, and lulling statements about FBN and their illicit boycott.

180.   For example upon learning about FBN's 2016 entry into the U.S. market as an electronic Crop Inputs sales platform, CHS officials distributed a letter to farmers attempting to discourage them from using FBN, falsely claiming that although an electronic platform like FBN would be able to offer the same products at cheaper prices, "FBN just does it with little overhead and without returning any profits to you the farmer, while lining the pockets of investors and big data companies like Google."[6]

181.   In fall 2018, after Syngenta's Head of Crop Protection Sales in the U.S. learned that a small number of branded Crop Inputs had been sold on electronic platforms in violation of Defendants' boycott, he falsely claimed that electronic platforms would deliver counterfeit products. He further claimed that "[w]hen online entities acquire products from sources other than authorized dealers or contracted distributors, you'd better question and be concerned about the quality."

182.   In its attempts to pressure all sellers to participate in the boycott of FBN, Syngenta's Head of U.S. Crop Protection Sales falsely justified its audit initiative by stating in a message sent over the wires: "We have concerns about product integrity, stewardship, and regulatory compliance."[7]

---

[6] Jacob Bunge, "Tech Startup, Trying to Be Amazon for Farms, Runs into Ag Giants," The Wall Street Journal (Aug. 30, 2020), https://www.wsj.com/articles/tech-startup-trying-to-be-amazon-for-farms-runs-into-ag-giants-11598811850.
[7] *Id.*

183. In announcing its decision not to deal with FBN in Canada, Univar, using the wires, distributed talking points on its decision and urged team members to share these talking points with retailers: "FBN is a data company that wants to collect and aggregate data to eventually sell for a profit to companies that will use the data to make farmers grow us food for nothing . . . If anyone thinks socialism is going to feed the world[,] just call Russia first and see how that worked out." Univar further criticized FBN's business model of bringing market transparency to farmers, declaring that "[m]argin compression is not the way to a brighter future and that is all FBN is currently offering." These talking points were also shared over the wires with its manufacturer suppliers.

184. Defendants used the interstate wires to receive and process payments from their illicit sales of the Crop Inputs based on a scheme to defraud to block electronic platforms from access to Crop Inputs by agreeing not to sell products to these platforms, including FBN, and misrepresenting the reasons for that decision.

185. In doing so, Defendants have deceived and cheated farmers out of billions of dollars for the last several years.

186. This pattern of racketeering is open-ended and remains ongoing. Only by pursuing this lawsuit and financially punishing Defendants will the pattern of racketeering at issue here finally cease.

187. The predicate acts are all related because they were all done in furtherance of the same overall goal and common purpose of the RICO enterprise: to force farmers to pay supra-competitive prices for Crop Inputs by blocking FBN (and dissuading others) from participating in the Crop Input market and bringing increased transparency to farmers.

E.    **Causation and Damages**

188.    Because it forces farmers to remain in an inefficient and opaque Crop Inputs market, the Crop Inputs Market Manipulation Enterprise directly caused farmers to pay more for Crop Inputs than they would have but for Defendants' wrongful conduct. There is a direct and straight line from the scheme to defraud to the damages suffered.

189.    There are no intervening steps or causes that could have prevented or altered or even interfered with the Crop Inputs Market Manipulation Enterprise.

190.    All purchasers of the Crop Inputs purchased Crop Inputs in reasonable reliance upon the representations that the marketplace was not being illegally manipulated.

191.    The exact purchase history of consumers, at the level of the individual consumer, is available from Retailer Defendants, other retailers, and other relevant data sources, so there is no real risk that the class will include any class members who were not harmed by Crop Inputs Market Manipulation Enterprise. The class will include those who purchased the Crop Inputs during the time of the market manipulation.

192.    By reason of and as a result of the conduct of Defendants, Plaintiff and Class members have been injured in their property through higher costs, less choice, and/or fewer innovative products or services. Plaintiff and Class Members are forced to pay more for Crop Inputs than they otherwise would have, have lost choices, and have lost the opportunity to purchase new and innovative products and services.

193.    The violations of 18 U.S.C. § 1962(c) and (d) by Defendants have directly and proximately caused injuries and damages to Plaintiff and Class members, and Plaintiff and Class members are entitled to bring this action for three times their actual damages, as well as costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(a) and (c).

## COUNT II
### Conspiracy to Restrain Trade in Violation of
### Section 1 of the Sherman Act, 15 U.S.C. § 1
### (on behalf of Plaintiff and the Nationwide Class)

194.    Plaintiff incorporates and realleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

195.    Beginning in at least 2014, and continuing thereafter to the present, Defendants, by and through their officers, directors, employees, agents, or other representatives, have explicitly or implicitly colluded to (1) artificially raise, fix, maintain, and/or stabilize prices in the Crop Inputs market, and (2) jointly boycott entities that would have introduced price-reducing electronic sales of Crop Inputs in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

196.    Defendants' actions were not mere parallel conduct but took place in the context of multiple facts evincing a conspiratorial agreement.

197.    First, the market for Crop Inputs is highly concentrated, as Defendants BASF, Corteva, Syngenta, and Bayer dominate production in virtually every Crop Inputs category, and control 85% of the corn seed market, over 75% of the soybean seed market, and over 90% of the cotton seed market. The wholesale market is just as concentrated, with seven wholesalers accounting for 70% of all sales volume.

198.    Second, an effective boycott of online sales platforms would not have been feasible without coordination and cooperation between Defendants. The boycott would only work if each Manufacturer Defendant agreed to the plan, otherwise one Manufacturer Defendant breaking with the boycott could have established itself as the primary supplier to online sales platforms and grown its customer base by operating a new distribution channel for Crop Inputs, taking market share from its rival manufacturers.

199.    Third, Defendants had a strong motive to conspire to preserve the presently opaque market structure. If online sales platforms succeeded in publicly publishing price lists for Crop Inputs, then the Defendants could no longer keep prices confidential and charge varying prices based on geography or through seed relabeling or bundling. The Wholesaler and Retailer Defendants were therefore motivated to conspire amongst themselves and exert pressure on the Manufacturer Defendants to protect their profits without having to compete on the merits of price and services.

200.    Fourth, Defendants formed and maintained their conspiracy using a high degree of inter-firm communication both directly and through wholesalers and retailers, such as through CropLife America's annual board of directors meeting which specifically discussed the threat posed by the entry of online sales platforms. Because no farmer representatives are allowed to participate, these meetings provided a forum for collusion.

201.    Fifth, Defendants' actions were against their apparent economic self- interest. Providing Crop Inputs to online sales platforms presented a significant business opportunity because those platforms represented well-financed customers ready to purchase Crop Inputs in bulk quantity from a Manufacturer or Wholesaler Defendant, would simplify the distribution channel and permit Manufacturer Defendant to retain greater profit by eliminating transport costs, rebates, and incentive programs to wholesalers and retailers, and presented an opportunity for an individual Manufacturer Defendant to increase profits by growing its market share through sales to farmers nationwide, not merely where its authorized retailers were located or enjoyed the largest market share within a specific geographic area.

202.    Sixth, Defendants are antitrust recidivists, which is probative of future collusion. *See, e.g.*, *In re Nat. Gas Commodity* Litig., 337 F. Supp. 2d 498, 500-01 (S.D.N.Y. 2004).

Competition experts have noted that past experience participating in cartels enables companies to spot opportunities to profitably engage in anticompetitive conduct while evading detection. Competition Policy International maintains a list of the "fifty-two leading recidivists," in which Defendants BASF and Bayer are among the top 5 leading antitrust recidivists, and Defendant Corteva is also listed.

203.    This conspiracy was a per se violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

204.    Alternatively, this conspiracy was a "quick look" or rule of reason violation of Section 1 of the Sherman Antitrust Act. There is no legitimate business justification for, or procompetitive benefits attributable to, Defendants' conspiracy and overt acts in furtherance thereof. Any business justification or pro-competitive benefits proffered by Defendants would be pretextual, outweighed by the anticompetitive effects of Defendants' conduct, and, in any event, could be achieved by means less restrictive than the conspiracy and overt acts alleged herein.

205.    Plaintiff and the other members of the Classes have been injured, and will continue to be injured, in their business and property by reason of Defendants' unlawful combination, contract, conspiracy, and agreement. Plaintiff and members of the Classes have paid more for Crop Inputs than they otherwise would have paid in the absence of Defendants' collusive conduct. This injury is of the type the federal antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

206.    In formulating and effectuating this conspiracy, Defendants did those things that they combined and conspired to do, including agreeing to boycott online sales platforms, including FBN and AgVend, by refusing to supply Crop Inputs manufactured by Manufacturer Defendants to online sales platforms.

207.    The combination and conspiracy alleged herein has had the following effects, among others:

a.    Price competition in the sale of Crop Inputs has been restrained, suppressed, and/or eliminated in the United States;

b.    Prices for Crop Inputs sold by Defendants and all of their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non- competitive levels throughout the United States; and

c.    Those who purchase Crop Inputs from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

208.    Plaintiff and Class members have been injured and will continue to be injured by paying more for Crop Inputs manufactured or sold by Defendants than they would have paid and will pay in the absence of the combination or conspiracy as alleged herein.

209.    Plaintiff and Class members are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## COUNT III
### Violation of State Antitrust Statutes

210.    Plaintiff incorporates and realleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

211.    During the Class Period, Defendants engaged in a continuing contract, combination, or conspiracy with respect to the sale of Crop Inputs in an unreasonable restraint of trade in commerce, in violation of the various state antitrust and consumer protection statutes set forth below.

212.    Defendants acts' and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for Crop Inputs.

213.    As a result of Defendants' unlawful conduct, Plaintiff and other similarly situated Class members who purchased Crop Inputs have been harmed by being forced to pay artificially inflated, supracompetitive prices for Crop Inputs.

214.    By engaging in the foregoing conduct, Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of the following state antitrust laws pleaded below.

215.    **Arizona.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Ariz. Rev. Stat. Ann. §§ 44-1402, *et seq.*** with respect to purchases of Crop Inputs in Arizona by Class members and/or purchases by Arizona residents.

   a.    Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated

   b.    throughout Arizona; (2) Crop Inputs prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

   c.    During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

   d.    As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with further injury.

   e.    Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq*. Accordingly, members of the Classes seek all forms of relief available under Ariz. Rev. Stat. Ann. §§ 44-1402, *et seq*.

216.    **California.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Cal. Bus. & Prof. Code, §§ 16720,** *et seq.* with respect to purchases of Crop Inputs in California by Class members and/or purchases by California residents.

a.    During the Class Period, Defendants entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Cal. Bus. & Prof. Code § 16720, each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of Crop Inputs at supracompetitive levels.

b.    The aforesaid violations of Cal. Bus. & Prof. Code § 16720, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of Crop Inputs.

c.    For the purpose of forming and effectuating the unlawful trust, the Defendants have done those things which they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth above and the following: (1) fixing, raising, stabilizing, and pegging the price of Crop Inputs.

d.    The combination and conspiracy alleged herein has had, inter alia, the following effects: (1) price competition in the sale of Crop Inputs has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for Crop Inputs sold by Defendants have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) those who purchased Crop Inputs directly or indirectly from Defendants have been deprived of the benefit of free and open competition.

e.       As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property in that they paid more for Crop Inputs than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Cal. Bus. & Prof. Code § 16720, members of the Classes seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Cal. Bus. & Prof. Code § 16720.

217.    **Connecticut.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Conn. Gen. Stat. § 35-26,** *et seq.* with respect to purchases of Crop Inputs in Connecticut by Class members and/or purchases by Connecticut residents.

a.       Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Connecticut; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Connecticut; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

b.       During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce.

c.       As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with further injury.

d.       By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Conn. Gen. Stat. § 35-26, *et seq.* Accordingly, members of the Classes seek all forms of relief available under Conn. Gen. Stat. § 35-24, *et seq.*

48

218. **Hawaii.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Haw. Rev. Stat. Ann. § 480-1,** *et seq.* with respect to purchases of Crop Inputs in Hawaii by Class members and/or purchases by Hawaii residents.

    a.    Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

    b.    During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce.

    c.    As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with further injury.

    d.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Haw. Rev. Stat. Ann. § 480-1, *et seq.* Accordingly, members of the Classes seek all forms of relief available under Haw. Rev. Stat. Ann. § 480-1, *et seq.*

219. **Illinois.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **740 Ill. Comp. Stat. Ann. 10/1,** *et seq.* with respect to purchases of Crop Inputs by Class members and/or purchases by Illinois residents.

    a.    Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Illinois;

(2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

b.    During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 740 Ill. Comp. Stat. Ann. 10/3, *et seq*. Accordingly, members of the Classes seek all forms of relief available under 740 Ill. Comp. Stat. Ann. 10/3, *et seq*.

220.    **Iowa.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Iowa Code §§ 553.4 *et seq*.** with respect to purchases of Crop Inputs in Iowa by Class members and/or purchases by Iowa residents.

a.    Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Iowa; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

b.    During the Class Period, Defendants' illegal conduct substantially affected Iowa

commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.4, *et seq*. Accordingly, members of the Classes seek all forms of relief available under Iowa Code §§ 553.4, *et seq*.

221.    **Kansas.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Kan. Stat. Ann. §§ 50-101, *et seq*.** with respect to purchases of Crop Inputs in Kansas by Class members and/or purchases by Kansas residents.

a.    Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

b.    During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kan. Stat. Ann. §§ 50-101, *et seq*. Accordingly, members of

the Classes seek all forms of relief available under Kan. Stat. Ann. §§ 50-101, *et seq*.

222.    **Maine.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Me. Rev. Stat. tit. 10, §§ 1101, *et seq*.** with respect to purchases of Crop Inputs in Maine by Class members and/or purchases by Maine residents.

a.    Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Maine; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) members of the Classes were deprived of free and open competition; and (4) members.

b.    of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

c.    During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

d.    As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with further injury.

e.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Me. Rev. Stat. tit. 10, §§ 1101, *et seq*. Accordingly, members of the Classes seek all relief available under Me. Rev. Stat. tit. 10, §§ 1101, *et seq*.

223.    **Maryland.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Md. Code, Com. Law §§ 11-201, *et seq*.** with respect to purchases of Crop Inputs in Maryland by Class members and/or purchases by Maryland residents.

a.    Defendants' combination or conspiracy had the following effects: (1) Crop Inputs

price competition was restrained, suppressed, and eliminated throughout Maryland; (2) Crop Inputs prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maryland; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

b.   During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce.

c.   As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Md. Code, Com. Law §§ 11-201, *et seq*. Accordingly, members of the Classes seek all relief available under Md. Code, Com. Law §§ 11-201, *et seq*.

224.   **Michigan.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Mich. Comp. Laws Ann. §§ 445.772, *et seq.*** with respect to purchases of Crop Inputs in Michigan by Class members and/or purchases by Michigan residents.

a.   Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Crop Inputs prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

     b.      During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

     c.      As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with further injury.

     d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mich. Comp. Laws Ann. §§ 445.772, *et seq.* Accordingly, members of the Classes seek all relief available under Mich. Comp. Laws Ann. §§ 445.772, *et seq.*

225.    **Minnesota.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Minn. Stat. §§ 325D.51, *et seq*.** with respect to purchases of Crop Inputs in Minnesota by Class members and/or purchases by Minnesota residents.

     a.      Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Crop Inputs prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

     b.      During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

     c.      As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minn. Stat. §§ 325D.51, *et seq*. Accordingly, members of the Classes seek all relief available under Minn. Stat. §§ 325D.51, *et seq*.

226.   **Mississippi.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Miss. Code Ann. §§ 75-21-3,** *et seq.* with respect to purchases of Crop Inputs in Mississippi by Class members and/or purchases by Mississippi residents.

a.      Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Crop Inputs prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

b.      During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Miss. Code Ann. §§ 75-21-3, *et seq*.

e.      Accordingly, members of the Classes seek all relief available under Miss. Code Ann. §§ 75-21-3, *et seq*.

227.   **Nebraska**. Defendants have entered into an unlawful agreement in restraint of trade in violation of **Neb. Rev. Stat. Ann. §§ 59-801,** *et seq.* with respect to purchases of Crop Inputs

in Nebraska by Class members and/or purchases by Nebraska residents.

    a.    Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Crop Inputs prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

    b.    During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

    c.    As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with further injury.

    d.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Neb. Rev. Stat. Ann. §§ 59-801, *et seq*. Accordingly, members of the Classes seek all relief available under Neb. Rev. Stat. Ann. §§ 59-801, *et seq*.

228.    **Nevada.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Nev. Rev. Stat. Ann. §§ 598A.060,** *et seq*. with respect to purchases of Crop Inputs in Nevada by Class members and/or purchases by Nevada residents.

    a.    Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Crop Inputs prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive,

artificially inflated prices for Crop Inputs.

b.      During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nev. Rev. Stat. Ann. §§ 598A.060, *et seq*. Accordingly, members of the Classes seek all relief available under Nev. Rev. Stat. Ann. §§ 598A.060, *et seq*.

229.    **New Hampshire.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **N.H. Rev. Stat. Ann. §§ 356:2, *et seq*.**, with respect to purchases of Crop Inputs in New Hampshire by Class members and/or purchases by New Hampshire residents.

a.      Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Crop Inputs prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

b.      During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with

further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.H. Rev. Stat. Ann. §§ 356:2, *et seq*. Accordingly, members of the Classes seek all relief available under N.H. Rev. Stat. Ann. §§ 356:2, *et seq*.

230.    **New Mexico.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **N.M. Stat. Ann. §§ 57-1-1, *et seq*.** with respect to purchases of Crop Inputs in New Mexico by Class members and/or purchases by New Mexico residents.

a.      Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Crop Inputs prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

b.      During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.M. Stat. Ann. §§ 57-1-1, *et seq*. Accordingly, members of the Classes seek all relief available under N.M. Stat. Ann. §§ 57-1-1, *et seq*.

231.    **New York.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **N.Y. Gen. Bus. Law §§ 340, *et seq*.** with respect to purchases of Crop Inputs

in New York by Class members and/or purchases by New York residents.

    a.    Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout New York; (2) Crop Inputs prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs, or purchased products that were otherwise of lower quality than they would have been absent the conspirators illegal acts, or were unable to purchase products that they otherwise would have purchased absent the illegal conduct.

    b.    During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

    c.    As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with further injury.

    d.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.Y. Gen. Bus. Law §§ 340, *et seq*. The conduct set forth above is a per se violation of the Act. Accordingly, members of the Classes seek all relief available under N.Y. Gen. Bus. Law §§ 340, *et seq*.

232.    **North Carolina.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **N.C. Gen. Stat. §§ 75-1, *et seq*.** with respect to purchases of Crop Inputs in North Carolina by Class members and/or purchases by North Carolina residents.

    a.    Defendants' combination or conspiracy had the following effects: (1) Crop Inputs

price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Crop Inputs prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

b.    During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

c.    As a direct and proximate result of the Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.C. Gen. Stat. §§ 75-1, *et seq*. Accordingly, members of the Classes seek all relief available under N.C. Gen. Stat. §§ 75-1, et. seq.

233.    **North Dakota**. Defendants have entered into an unlawful agreement in restraint of trade in violation of **N.D. Cent. Code §§ 51-08.1-01,** *et seq*. with respect to purchases of Crop Inputs in North Dakota by Class members and/or purchases by North Dakota residents.

a.    Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Crop Inputs prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

b.    During the Class Period, Defendants' illegal conduct had a substantial effect on

North Dakota commerce.

c.     As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.D. Cent. Code §§ 51-08.1-01, *et seq*. Accordingly, members of the Classes seek all relief available under N.D. Cent. Code §§ 51-08.1-01, *et seq*.

234.     **Oregon.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Or. Rev. Stat. §§ 646.705, *et seq*.**, with respect to purchases of Crop Inputs in Oregon by Class members and/or purchases by Oregon residents.

a.     Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Crop Inputs prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

b.     During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

c.     As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Or. Rev. Stat. §§ 646.705, *et seq*. Accordingly, members of the

Classes seek all relief available under Or. Rev. Stat. §§ 646.705, *et seq.*

235.    **Rhode Island.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **6 R.I. Gen. Laws Ann. §§ 6-36-4,** *et seq.* with respect to purchases of Crop Inputs in Rhode Island by Class members and/or purchases by Rhode Island residents.

a.    Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

b.    During the Class Period, Defendants' illegal conduct substantially affected Rhode Island commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 6 R.I. Gen. Laws Ann. §§ 6-36-4, *et seq.* Accordingly, members of the Classes seek all forms of relief available under 6 R.I. Gen. Laws Ann. §§ 6-13.1-1, *et seq.*

236.    **South Dakota.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **S.D. Codified Laws §§ 37-1-3.1,** *et seq.* with respect to purchases of Crop Inputs in South Dakota by Class members and/or purchases by South Dakota residents.

a.    Defendants' combination or conspiracy had the following effects: (1) Crop Inputs

price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Crop Inputs prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

b.  During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with further injury.

d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of S.D. Codified Laws §§ 37-1-3.1, *et seq*. Accordingly, members of the Classes seek all relief available under S.D. Codified Laws §§ 37-1-3.1, *et seq*.

237.  **Tennessee**. Defendants have entered into an unlawful agreement in restraint of trade in violation of **Tenn. Code Ann. §§ 47-25-101, *et seq*.** with respect to purchases of Crop Inputs in Tennessee by Class members and/or purchases by Tennessee residents.

a.  Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

b.  During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce.

c.  As a direct and proximate result of the Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with further injury.

d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tenn. Code Ann. §§ 47-25-101, *et seq*. Accordingly, members of the Classes seek all relief available under Tenn. Code Ann. §§ 47-25-101, *et seq*.

238.  **Utah.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Utah Code Ann. §§ 76-10-3101, *et seq*.** with respect to purchases of Crop Inputs in Utah by Class members and/or purchases by Utah residents.

a.  Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Utah; (2) Crop Inputs prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

b.  During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with further injury.

d.  By reason of the foregoing, Defendants have entered into agreements in restraint of

trade in violation of Utah Code Ann. §§ 76-10-3101, *et seq*. Accordingly, members of the Classes seek all relief available under Utah Code Ann. §§ 76-10-3101, *et seq*.

239.    **Vermont.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Vt. Stat. Ann. tit. 9, §§ 2453, *et seq*.** with respect to purchases of Crop Inputs in Vermont by Class members and/or purchases by Vermont residents.

    a.    Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Crop Inputs prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

    b.    During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce.

    c.    As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with further injury.

    d.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vt. Stat. Ann. tit. 9, §§ 2453, *et seq*.

    e.    Accordingly, members of the Classes seek all relief available under Vt. Stat. Ann. tit. 9, §§ 2453, *et seq*.

240.    **West Virginia.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **W. Va. Code §§ 47-18-4, *et seq*.** with respect to purchases of Crop Inputs in West Virginia by Class members and/or purchases by West Virginia residents.

a.     Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Crop Inputs prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

b.     During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

c.     As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of W. Va. Code §§ 47-18-1, *et seq*. Accordingly, members of the Classes seek all relief available under W. Va. Code §§ 47-18-1, *et seq*.

241.    **Wisconsin.** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Wis. Stat. §§ 133.01 *et seq*.** with respect to purchases of Crop Inputs in Wisconsin by Class members and/or purchases by Wisconsin residents.

a.     Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Crop Inputs prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin;

b.     members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop

Inputs.

c.    During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

d.    As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with further injury.

e.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wis. Stat. §§ 133.01, *et seq*. Accordingly, members of the Classes seek all relief available under Wis. Stat. §§ 133.01, *et seq*.

**COUNT IV**
**Violation of State Consumer Protection Statutes**

242.    Plaintiff incorporates and realleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

243.    Defendants engaged in unfair competition, or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

244.    **Arizona.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Ariz. Rev. Stat. Ann. §§ 44-1521, *et seq*.**, with respect to purchases of Crop Inputs in Arizona by Class members and/or purchases by Arizona residents.

a.    Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non- competitive and artificially inflated levels, the prices at which Crop Inputs were sold, distributed, or obtained in Arizona and took efforts to conceal their agreements

from members of the Classes.

b.     The aforementioned conduct on the part of the Defendants constituted deceptive or unfair acts or practices in violation of Ariz. Rev. Stat. Ann. § 44-1522(A).

c.     Defendants' unlawful conduct had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Arizona; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

d.     During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce and consumers.

e.     As a direct and proximate result of the unlawful conduct of Defendants, members of the Classes have been injured in their business and property and are threatened with further injury.

f.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. Ann. § 44-1522, and, accordingly, members of the Classes seek all relief available under that statute.

245.     **Arkansas.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Ark. Code §§ 4- 88-101, *et seq*.**, with respect to purchases of Crop Inputs in Arkansas by Class members and/or purchases by Arkansas residents.

a.     Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non- competitive

and artificially inflated levels, the prices at which Crop Inputs were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from members of the Classes.

b.    The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Ark. Code Ann. § 4-88-107(a)(10).

c.    Defendants' unlawful conduct had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

d.    During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

e.    As a direct and proximate result of the unlawful conduct of Defendants, members of the Classes have been injured in their business and property and are threatened with further injury.

f.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code Ann., § 4-88-107(a)(10) and, accordingly, members of the Classes seek all relief available under that statute.

246.    **California**. Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Cal. Bus. & Prof. Code §§ 17200, *et seq*.**, with respect to purchases of Crop Inputs in California by Class members and/or

purchases by California residents.

a. During the Class Period, Defendants marketed, sold, or distributed Crop Inputs in California, and committed and continue to commit acts of unfair competition, as defined by Cal. Bus. & Prof. Code §§ 17200, *et seq.*, by engaging in the acts and practices specified above.

b. This claim is instituted pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204, to obtain restitution from these Defendants for acts, as alleged herein, that violated Cal. Bus. & Prof. Code § 17200, commonly known as the Unfair Competition Law.

c. Defendants' conduct as alleged herein violated Cal. Bus. & Prof. Code § 17200. The acts, omissions, misrepresentations, practices and non- disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of Cal. Bus. & Prof. Code §§ 17200, *et seq.*, including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Cal. Bus. & Prof. Code § 16720, *et seq.*, set forth above.

d. Defendants' acts, omissions, misrepresentations, practices, and non- disclosures, as described above, are otherwise unfair, unconscionable,

e. unlawful or fraudulent, whether or not in violation of Cal. Bus. & Prof. Code §§ 16720, *et seq.*, and whether or not concerted or independent acts.

f. Defendants' acts or practices are unfair to consumers of Crop Inputs in the State of California within the meaning of Cal. Bus. & Prof. Code § 17200.

g. Defendants' acts and practices are fraudulent or deceptive within the meaning of

Cal. Bus. & Prof. Code § 17200.

h.    Members of the Classes are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

i.    The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

j.    The unlawful and unfair business practices of Defendants, each of them, have caused and continue to cause the members of the Classes to pay supracompetitive and artificially inflated prices for Crop Inputs. Members of the Classes suffered injury in fact and lost money or property as a result of such unfair competition.

k.    The conduct of Defendants as alleged in this Complaint violates Cal. Bus. & Prof. Code § 17200.

l.    As alleged in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiff and the members of the Classes are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204.

247.    **District of Columbia.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **D.C. Code §§ 28-3901,** *et seq.* with respect to purchases of Crop Inputs in D.C. by Class members and/or purchases by D.C. residents.

a.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by

affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which Crop Inputs were sold, distributed or obtained in the District of Columbia.

b.    The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. Members of the Classes were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Crop Inputs. Defendants had the sole power to set that price and members of the Classes had no power to negotiate a lower price. Moreover, members of the Classes lacked any meaningful choice in purchasing Crop Inputs because they were unaware of the unlawful overcharge and there was no alternative source of supply through which members of the Classes could avoid the overcharges. Defendants' conduct with regard to sales of Crop Inputs, including their illegal conspiracy to secretly fix the price of Crop Inputs at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of members of the Classes. Defendants took grossly unfair advantage of members of the Classes. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Crop Inputs.

c.    Defendants' unlawful conduct had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout the District of

Columbia; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia;

d.      members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

e.      As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. Code §§ 28-3901, *et seq.*, and, accordingly, members of the Classes seek all relief available under that statute.

248.    **Florida.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Fla. Stat. §§ 501.201,** *et seq.*, with respect to purchases of Crop Inputs in Florida by Class members and/or purchases by Florida residents.

a.      Defendants' unlawful conduct had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Florida; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

b.      During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

c.      As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured and are threatened with further injury.

      d.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. §§ 501.201, *et seq*., and, accordingly, members of the Classes seek all relief available under that statute.

249.   **Hawaii**. Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Haw. Rev. Stat. Ann. §§ 480-1, *et seq*.** with respect to purchases of Crop Inputs in Hawaii by Class members and/or purchases by Hawaii residents.

      a.     Defendants' unlawful conduct had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supra-competitive, artificially inflated prices for Crop Inputs.

      b.     During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

      c.     As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured and are threatened with further injury.

      d.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. Ann. §§ 480-1, et seq., and, accordingly, members of the Classes seek all relief available under that statute.

250.   **Illinois**. Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **815 Ill. Comp. Stat. Ann. 505/1, *et seq*.** with respect to purchases of Crop Inputs in Illinois by Class members and/or purchases by Illinois

residents.

    a.    Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Illinois; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

    b.    During the Class Period, Defendants' illegal conduct had a substantial effect on Illinois commerce.

    c.    As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with further injury.

    d.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. Ann. 505/1, et seq., and, accordingly, members of the Classes seek all relief available under that statute.

251.    **Kansas.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Kan. Stat. Ann. §§ 50-623,** *et seq.*, with respect to purchases of Crop Inputs in Kansas by Class members and/or purchases by Kansas residents.

    a.    Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) members of the Classes were deprived of free

and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

b.    During the Class Period, Defendants' illegal conduct had a substantial effect on Kansas commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with further injury.

d.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. Ann. §§ 50-623, et seq. and, accordingly, members of the Classes seek all relief available under that statute.

252.    **Maine.** have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Me. Rev. Stat. tit. 5, §§ 207, *et seq*.** with respect to purchases of Crop Inputs in Maine by Class members and/or purchases by Maine residents.

a.    Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Maine; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

b.    During the Class Period, Defendants' illegal conduct had a substantial effect on Maine commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with

further injury.

d.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Me. Rev. Stat. tit. 5, §§ 207, et seq., and, accordingly, members of the Classes seek all relief available under that statute.

253.   **Massachusetts.** have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Mass. Gen. Laws ch. 93A, § 2** with respect to purchases of Crop Inputs in Massachusetts by Class members and/or purchases by Massachusetts residents.

a.     Defendants were engaged in trade or commerce as defined by Mass. Gen. Laws ch. 93A.

b.     Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market which includes Massachusetts, by affecting, fixing, controlling, and/or maintaining at artificial and non-competitive levels, the prices at which Crop Inputs were sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from members of the Classes.

c.     Defendants' unlawful conduct had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

d.     As a direct and proximate result of Defendants' unlawful conduct, members of the Classes were injured and are threatened with further injury.

e.     Defendants have or will be served with a demand letter in accordance with Mass. Gen. Laws ch. 93A, § 9, or, upon information and belief, such service of a demand letter was unnecessary due to the defendant not maintaining a place of business within the Commonwealth of Massachusetts or not keeping assets within the Commonwealth.

f.     By reason of the foregoing, Defendants engaged in unfair competition and unfair or deceptive acts or practices, in violation of Mass. Gen. Laws ch. 93A, §2. Defendants' violations of Chapter 93A were knowing or willful, entitling members of the Classes to multiple damages.

254.   **Michigan.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Mich. Comp. Laws Ann. §§ 445.901, *et seq*.** with respect to purchases of Crop Inputs in Michigan by Class members and/or purchases by Michigan residents.

a.     Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

b.     During the Class Period, Defendants' illegal conduct had a substantial effect on Michigan commerce.

c.     As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with

further injury.

d.       Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Comp. Laws Ann. §§ 445.901, et seq., and, accordingly, members of the Classes seek all relief available under that statute.

255.    **Minnesota.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Minn. Stat. §§ 325F.68, et seq.**, and **Minn. Stat. § 8.31** with respect to purchases of Crop Inputs in Minnesota by Class members and/or purchases by Minnesota residents.

a.       Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

b.       During the Class Period, Defendants' illegal conduct had a substantial effect on Minnesota commerce.

c.       As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with further injury.

d.       Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31 and, accordingly, members of the Classes seek all relief available under that statute.

256.    **Missouri.** Defendants have engaged in unfair competition or unfair,

unconscionable, deceptive or fraudulent acts or practices in violation of **Mo. Ann. Stat. §§ 407.010,** *et seq.***,** with respect to purchases of Crop Inputs in Missouri by Class members and/or purchases by Missouri residents.

    a.    Plaintiff and the Class purchased Crop Inputs for personal, family, or household purposes.

    b.    Defendants engaged in the conduct described herein in connection with the sale of Crop Inputs in trade or commerce in a market that includes Missouri.

    c.    Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which Crop Inputs were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to members of the Classes.

    d.    Defendants concealed, suppressed, and omitted to disclose material facts to members of the Classes concerning Defendants' unlawful activities and artificially inflated prices for Crop Inputs. The concealed, suppressed, and omitted facts would have been important to members of the Classes as they related to the cost of Crop Inputs they purchased.

    e.    Defendants misrepresented the real cause of price increases and/or the absence of price reductions in Crop Inputs by making public statements that were not in accord with the facts.

    f.    Defendants' statements and conduct concerning the price of Crop Inputs were deceptive as they had the tendency or capacity to mislead members of the Classes

to believe that they were purchasing Crop Inputs at prices established by a free and fair market.

g.  Defendants' unlawful conduct had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Missouri; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) members of the

h.  Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

i.  The foregoing acts and practices constituted unlawful practices in violation of Mo. Ann. Stat. §§ 407.010, et seq.

j.  As a direct and proximate result of the above-described unlawful practices, members of the Classes suffered ascertainable loss of money or property.

k.  Accordingly, members of the Classes seek all relief available under Mo. Ann. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…," as further interpreted by Mo. Code Regs. Ann. tit. 15, §§ 60-7.010, et seq., Mo. Code Regs. Ann. tit. 15, §§ 60-8.010, et seq., and Mo. Code Regs. Ann. tit. 15, §§ 60-9.010, et seq., and Mo. Ann. Stat. § 407.025, which provides for the relief sought in this count.

257.  **Montana.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Mont. Code §§ 30-14-**

**101,** *et seq.* with respect to purchases of Crop Inputs in Montana by Class members and/or purchases by Montana residents.

a.    Defendants' unlawful conduct had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Montana; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

b.    During the Class Period, Defendants' illegal conduct substantially affected Montana commerce and consumers.

c.    As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured and are threatened with further injury.

d.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-101, et seq., and, accordingly, members of the Classes seek all relief available under that statute.

258.    **Nebraska.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Neb. Rev. Stat. Ann. §§ 59-1601,** *et seq*., with respect to purchases of Crop Inputs in Nebraska by Class members and/or purchases by Nebraska residents.

a.    Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) members of the Classes were deprived of free

and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

b.    During the Class Period, Defendants' illegal conduct had a substantial effect on Nebraska commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with further injury.

d.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. Ann. §§ 59-1601, et seq. and, accordingly, members of the Classes seek all relief available under that statute.

259.    **Nevada.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Nev. Rev. Stat. Ann. §§ 598.0903,** *et seq.* with respect to purchases of Crop Inputs in Nevada by Class members and/or purchases by Nevada residents.

a.    Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

b.    During the Class Period, Defendants' illegal conduct had a substantial effect on Nevada commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, members of the

Classes have been injured in their business and property and are threatened with further injury.

d.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. Ann. §§ 598.0903, et seq. and, accordingly, members of the Classes seek all relief available under that statute.

260.  **New Hampshire.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **N.H. Rev. Stat. Ann. §§ 358-A:1, *et seq*.** with respect to purchases of Crop Inputs in New Hampshire by Class members and/or purchases by New Hampshire residents.

a.  Defendants willingly and knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Crop Inputs were sold, distributed or obtained in New Hampshire and took efforts to conceal their agreements from members of the Classes.

b.  The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.H. Rev. Stat. §§ 358-A:1, et seq., in that such conduct, inter alia, resulted in a gross disparity between the value received by members of the Classes and the prices paid by them for Crop Inputs as set forth in N.H. Rev. Stat. §§ 358-A:1, et seq.. Members of the Classes were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Crop Inputs. Defendants had the sole power to set that price and members of the Classes

had no power to negotiate a lower price. Moreover, members of the Classes lacked any meaningful choice in purchasing Crop Inputs because they were unaware of the unlawful overcharge and there was no alternative source of supply through which members of the Classes could avoid the overcharges. Defendants' conduct with regard to sales of Crop Inputs, including their illegal conspiracy to secretly fix the price of Crop Inputs at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of members of the Classes. Defendants took grossly unfair advantage of members of the Classes. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Crop Inputs.

c.    Defendants' unlawful conduct had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) members of the Classes were deprived of free and open competition; and

d.    (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

e.    During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce and consumers.

f.    As a direct and proximate result of the unlawful conduct of Defendants, members of the Classes have been injured and are threatened with further injury.

    g.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. Ann. §§ 358-A:1, et seq., and, accordingly, members of the Classes seek all relief available under that statute.

261.  **New Mexico.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **N.M. Stat. Ann. §§ 57-12-1, *et seq*.** with respect to purchases of Crop Inputs in New Mexico by Class members and/or purchases by New Mexico residents.

    a.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Crop Inputs were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from members of the Classes.

    b.    The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.M. Stat. Ann. § 57-12-3, in that such conduct, inter alia, resulted in a gross disparity between the value received by members of the Classes and the prices paid by them for Crop Inputs as set forth in N.M. Stat. Ann. § 57-12-2(E). Members of the Classes were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Crop Inputs. Defendants had the sole power to set that price and members of the Classes had no power to negotiate a lower price. Moreover, members of the Classes lacked any meaningful choice in purchasing Crop Inputs because they were unaware of the unlawful

overcharge and there was no alternative source of supply through which members of the Classes could avoid the overcharges. Defendants' conduct with regard to sales of Crop Inputs, including their illegal conspiracy to secretly fix the price of Crop Inputs at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of members of the Classes. Defendants took grossly unfair advantage of members of the Classes. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Crop Inputs.

c.    Defendants' unlawful conduct had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

d.    During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

e.    As a direct and proximate result of the unlawful conduct of Defendants, members of the Classes have been injured and are threatened with further injury.

f.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. §§ 57-12-1, et seq., and, accordingly, members of the Classes seek all relief available under that statute.

262. **New York**. Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **N.Y. Gen. Bus. Law §§ 349, *et seq.*** with respect to purchases of Crop Inputs in New York by Class members and/or purchases by New York residents.

    a.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non- competitive levels, the prices at which Crop Inputs were sold, distributed or obtained in New York and took efforts to conceal their agreements from members of the Classes.

    b.    Defendants made public statements about the prices of Crop Inputs that Defendants knew would be seen by New York consumers; such statements either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for Crop Inputs; and Defendants alone possessed material information that was relevant to consumers but failed to provide the information.

    c.    Because of Defendants' unlawful trade practices in the State of New York, New York consumer class members who indirectly purchased Crop Inputs were misled to believe that they were paying a fair price for Crop Inputs or the price increases for Crop Inputs were for valid business reasons; and similarly situated consumers were potentially affected by Defendants' conspiracy.

    d.    Defendants knew that their unlawful trade practices with respect to pricing Crop Inputs would have an impact on New York consumers and not just the Defendants' direct customers.

    e.    Defendants knew that their unlawful trade practices with respect to pricing Crop

Inputs would have a broad impact, causing consumer class members who indirectly purchased Crop Inputs to be injured by paying more for Crop Inputs than they would have paid in the absence of Defendants' unlawful trade acts and practices.

f.    The conduct of the Defendants described herein constitutes consumer- oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

g.    Defendants' unlawful conduct had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout New York; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

h.    During the Class Period, Defendants' marketed, sold, or distributed Crop Inputs in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers.

i.    During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Crop Inputs in New York.

j.    Members of the Classes seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

263.    **North Carolina.** Defendants have engaged in unfair competition or unfair,

unconscionable, deceptive or fraudulent acts or practices in violation of **N.C. Gen. Stat. §§ 75-1.1, *et seq*.** with respect to purchases of Crop Inputs in North Carolina by Class members and/or purchases by North Carolina residents.

a.  Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non- competitive levels, the prices at which Crop Inputs were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from members of the Classes.

b.  Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation, and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which members of the Classes could not possibly have been aware. Defendants publicly provided pre-textual and false justifications regarding their price increases. Defendants' public statements concerning the price of Crop Inputs created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy.

c.  Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders, conducting meetings and conversations in secret, and avoiding the creation of documents which would reveal the antitrust violations.

d.  The conduct of the Defendants described herein constitutes consumer- oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and

harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

e.    Defendants' unlawful conduct had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

f.    During the Class Period, Defendants' marketed, sold, or distributed Crop Inputs in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers.

g.    During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Crop Inputs in North Carolina.

h.    Members of the Classes seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. §§ 75- 1.1, et seq., and, accordingly, members of the Classes seek all relief available under that statute.

264.    **Oregon.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Or. Rev. Stat. §§ 646.605, *et seq*.** with respect to purchases of Crop Inputs in Oregon by Class members and/or purchases by Oregon residents.

a.    Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

b.    During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with further injury.

d.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. §§ 646.605, et seq., and, accordingly, members of the Classes seek all relief available under that statute.

265.    **Rhode Island.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **6 R.I. Gen. Laws Ann. §§ 6-13.1-1,** *et seq.* with respect to purchases of Crop Inputs in Rhode Island by Class members and/or purchases by Rhode Island residents.

a.    Members of this Class purchased Crop Inputs for personal, family, or household purposes.

b.    Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Crop

Inputs were sold, distributed, or obtained in Rhode Island.

c.     Defendants deliberately failed to disclose material facts to members of the Classes concerning Defendants' unlawful activities and artificially inflated prices for Crop Inputs. Defendants owed a duty to disclose such facts and considering the relative lack of sophistication of the average, non-business consumer, Defendants breached that duty by their silence. Defendants misrepresented to all consumers during the Class Period that Defendants' Crop Inputs prices were competitive and fair.

d.     Defendants' unlawful conduct had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

e.     As a direct and proximate result of the Defendants' violations of law, members of the Classes suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein.

f.     Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Crop Inputs, likely misled all consumers acting reasonably under the circumstances to believe that they were purchasing Crop Inputs at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to members of

the Classes as they related to the cost of Crop Inputs they purchased.

g.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Rhode Island Gen. Laws. Ann. § 6-13.1-1, et seq., and, accordingly, members of the Classes seek all relief available under that statute.

266.    **South Carolina.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **S.C. Code Ann. §§ 39-5-10, *et seq.*** with respect to purchases of Crop Inputs in South Carolina by Class members and/or purchases by South Carolina residents.

a.    Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

b.    During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with further injury.

d.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, et seq., and, accordingly, members of the Classes seek all relief available under that statute.

267.    **South Dakota**. Defendants have engaged in unfair competition or unfair,

unconscionable, deceptive or fraudulent acts or practices in violation of **S.D. Codified Laws § 37-24-6** with respect to purchases of Crop Inputs in South Dakota by Class members and/or purchases by South Dakota residents.

  a. Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

  b. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

  c. As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with further injury.

  d. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-6, and, accordingly, members of the Classes seek all relief available under that statute.

268. **Tennessee.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Tenn. Code Ann. §§ 47-18-101, *et seq*.** with respect to purchases of Crop Inputs in Tennessee by Class members and/or purchases by Tennessee residents.

  a. Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout

Tennessee; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee;

b.     (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

c.     During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce.

d.     As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with further injury.

e.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code Ann. §§ 47-18-101, et seq, and, accordingly, members of the Classes seek all relief available under that statute.

269.   **Utah.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Utah Code Ann. §§ 13-11-1, *et seq*.** with respect to purchases of Crop Inputs in Utah by Class members and/or purchases by Utah residents.

a.     Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Utah; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

b.     During the Class Period, Defendants' illegal conduct had a substantial effect on

Utah commerce.

c.     As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with further injury.

d.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code Ann. §§ 13-11-1, et seq.,

e.     accordingly, members of the Classes seek all relief available under that statute.

270.     **Virginia.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Va. Code Ann. §§ 59.1-196, *et seq*.** with respect to purchases of Crop Inputs in Virginia by Class members and/or purchases by Virginia residents.

a.     Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Virginia; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Virginia; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

b.     During the Class Period, Defendants' illegal conduct had a substantial effect on Virginia commerce.

c.     As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with further injury.

d.     Defendants have engaged in unfair competition or unfair or deceptive acts or

practices in violation of Va. Code Ann. §§ 59.1-196, et seq, and, accordingly, members of the Classes seek all relief available under that statute.

271. **Vermont.** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **Vt. Stat. Ann. tit. 9, §§ 2453, *et seq*.** with respect to purchases of Crop Inputs in Vermont by Class members and/or purchases by Vermont residents.

a. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Crop Inputs were sold, distributed, or obtained in Vermont.

b. Defendants deliberately failed to disclose material facts to members of the Classes concerning their unlawful activities and artificially inflated prices for Crop Inputs. Defendants owed a duty to disclose such facts and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that their Crop Inputs prices were competitive and fair.

c. Defendants' unlawful conduct had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

d. As a direct and proximate result of Defendants' violations of law, members of the

Classes suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by the Defendants' willful and deceptive conduct, as described herein.

e.  Defendants' deception, including their omissions concerning the price of Crop Inputs, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Crop Inputs at prices born by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of Vt. Stat. Ann. tit. 9, §§ 2451, et seq., and, accordingly, members of the Classes seek all relief available under that statute.

272.  **West Virginia**. Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of **W. Va. Code §§ 46A-6-101, *et seq*.** with respect to purchases of Crop Inputs in West Virginia by Class members and/or purchases by West Virginia residents.

a.  Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

b.  During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with further injury.

d.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code §§ 46A-6-101, et seq. and, accordingly, members of the Classes seek all relief available under that statute.

273.    Plaintiff and members of the Classes have been injured in their business and property by reason of Defendants' anticompetitive, unfair, unconscionable, and/or deceptive conduct. Their injury consists of paying higher prices for Crop Inputs than they would have paid in the absence of these violations. This injury is of the type the state consumer protection statutes were designed to prevent and directly results from Defendants' unlawful conduct.

274.    On behalf of itself and the Class, Plaintiff seeks all appropriate relief provided for under the foregoing statutes.

## COUNT V
### Unjust Enrichment
### (on behalf of Plaintiff and the Nationwide Class)

275.    Plaintiff incorporates and realleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

276.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Crop Inputs.

277.    Defendants have benefited from their unlawful acts and it would be inequitable under unjust enrichment principles under the laws of each state in the United States for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by

Plaintiff or the Class members for Crop Inputs.

278.    As a direct and proximate result of Defendants' conduct described above, Defendants have and will continue to be unjustly enriched by the receipt of unlawfully inflated prices and unlawful profits from Defendants' sales of Crop Inputs.

## X.    PRAYER FOR RELIEF

279.    **WHEREFORE**, Plaintiff and the Class members request the Court to enter judgment in their favor against Defendants, awarding all such relief as the Court deems appropriate and just.

280.    Plaintiff requests the following relief:

A.    That the Court determines that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and its counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.    That the unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed:

a.    An unlawful enterprise engaged in, or the activities of which affect, interstate or foreign commerce, that Defendants conduct or participate, directly or indirectly, in the conduct of through a pattern of racketeering activity;

b.    An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

c.    A per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

   d.  An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and

   e.  Acts of unjust enrichment by Defendants as set forth herein.

C.  Order Defendants to disgorge unlawful profits,

D.  That Plaintiff and the Classes recover damages, to the maximum extent allowed under the applicable state laws, and that a joint and several judgments in favor of Plaintiff and the members of the Classes be entered against Defendants in an amount to be trebled to the extent such laws permit;

E.  Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

F.  Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits identification of company's information;

G.  Plaintiff and the members of the Classes be awarded pre-and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from

and after the date of service of the Complaint;

H.      Plaintiff and the Class members recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.      Plaintiff and the Class members have such other and further relief as the case may require and the Court deem just and proper.

## XI.     JURY TRIAL DEMAND

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, on all issues so triable.

Dated: March 17, 2021                          Respectfully submitted,

                                                 /s/ *Rhett A. McSweeney*
                                                Rhett A. McSweeney (#269542)
                                                Jonathan R. Mencel (#390056)
                                                **MCSWEENEY LANGEVIN**
                                                2116 Second Avenue South
                                                Minneapolis, MN 55404
                                                Tel:     (612) 746-4646
                                                Fax:     (612) 454-2678
                                                ram@westrikeback.com
                                                jon@westrikeback.com
                                                filing@westrikeback.com

                                                William G. Caldes
                                                (*Pro Hac Vice Forthcoming*)
                                                Jeffrey J. Corrigan
                                                (*Pro Hac Vice Forthcoming*)
                                                Jeffrey L. Spector
                                                (*Pro Hac Vice Forthcoming*)
                                                Icee N. Etheridge
                                                (*Pro Hac Vice Forthcoming*)
                                                **SPECTOR ROSEMAN & KODROFF, P.C.**
                                                2001 Market Street, Suite 3420
                                                Philadelphia, PA  19103
                                                Tel:     (215) 496-0300
                                                Fax:     (215) 496-6611
                                                bcaldes@srkattorneys.com
                                                jcorrigan@srkattorneys.com
                                                jspector@srkattorneys.com

ietheridge@srkattorneys.com

Mark K. Wasvary
(*Pro Hac Vice Forthcoming*)
**MARK K. WASVARY, P.C.**
2401 W. Big Beaver Rd, STE 100
Troy, MI 48084
Tel:    248-649-5667
Fax:    248-649-5668
markwasvary@hotmail.com

Brian P. Murray
(*Pro Hac Vice Forthcoming*)
Lee Albert
(*Pro Hac Vice Forthcoming*)
**GLANCY PRONGAY & MURRAY LLP**
230 Park Avenue, Suite. 530
New York, NY 10169
Tel: (212) 682-5340
Fax: (212) 884-0988
bmurray@glancylaw.com
lalbert@glancylaw.com

Steven A. Kanner
(*Pro Hac Vice Forthcoming*)
Jonathan M. Jagher
(*Pro Hac Vice Forthcoming*)
**FREED KANNER LONDON & MILLEN LLC**
2201 Waukegan Rd, Suite 130
Bannockburn, IL 60015
Tel:    (224) 632-4500
Fax:    (224) 632-4521
skanner@fklmlaw.com
jjagher@fklmlaw.com

David P. McLafferty (*Pro Hac Vice Forthcoming*)
**MCLAFFERTY LAW FIRM, P.C.**
923 Fayette Street
Conshohocken, PA 19428
Tel:    (610) 940-4000 ext. 12
Fax:    (610) 940-4007
dmclafferty@mclaffertylaw.com

*Attorneys for Plaintiff*